**Beverly RATLIFF, Plaintiff,**

**v.**

**The CITY OF MILWAUKEE, Harold A. Breier, individually and in his official capacity as the Chief of Police of the City of Milwaukee Police Department, Raymond Beste, individually and in his official capacity as Captain of Police of the City of Milwaukee Police Department, Joseph Kalivoda, individually and in his official capacity as Captain of Police of the City of Milwaukee Police Department, Edward Kondracki, individually and in his official capacity as Lieutenant of Police of the City of Milwaukee Police Department, Charles Figer, individually and in his official capacity as Sergeant of Police of the City of Milwaukee Police Department and Edward Majkowski, individually and in his official capacity as Sergeant of Police of the City of Milwaukee Police Department, Defendants.**

No. 81–C–1407.

United States District Court,
E.D. Wisconsin.

May 9, 1985.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for plaintiff.

Bruce D. Schrimpf, Asst. City Atty., Milwaukee, Wis., for defendants.

## DECISION AND ORDER

WARREN, District Judge.

On November 4, 1981, plaintiff filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and under 42 U.S.C. §§ 1983 and 1985. Essentially, the complaint alleges that the defendants discriminated against the plaintiff on the basis of her race and sex in terminating her employment as a police officer for the City of Milwaukee. Subject matter jurisdiction exists under Title VII, 42 U.S.C. § 2000e, *et seq.*, and 28 U.S.C. §§ 1331 and 1343. The matter was tried to the Court, commencing on January 31, 1983, through February 4, 1983. Additional testimony was taken on February 7 and 8 and April 4 of the same year. Pursuant to Rule 52(a), Federal Rules of Civil Procedure, the following shall comprise the Court's Findings of Fact and Conclusions of Law.

### I. *Background*

Plaintiff is a single, adult, black female who resides with her son in a portion of a duplex owned by her parents in the City of Milwaukee. She was born and grew up in Milwaukee, attending Holy Cross Lutheran Grade School and Thomas Edison School. She graduated from Rufus King High School. She attended Milwaukee Area Technical College on and off from 1973 to 1976, also working at various times as an order filler in a crafts store, a dietary assistant in a hospital, and as a bartender. In 1977, she applied for employment with the Milwaukee Police Department and passed the written qualifying exam but failed the physical exam. A second application came to naught when she failed the written exam. After the requisite waiting period, she applied a third time and was successful in passing the written exam, the physical ability test, the background investigation and the oral interview. She was placed as number ten on a waiting list of eligibles and then commenced employment as a member of a trainee class at the Milwaukee Police Academy on October 30, 1978. Such employment was in a probationary status until October 29, 1979.

### II. *Academy Training*

Ms. Ratliff began her employment with the Milwaukee Police Department as one of approximately twenty trainees at the Milwaukee Police Academy. Graduation from the Police Academy is a condition precedent to assignment to a district as an "on-the-street" police officer. Her academy training lasted approximately twenty weeks, during which time she was instructed in the areas of criminal law generally, city ordinances, search and seizure, report writing, traffic laws, self-defense, and firearms training. In addition, Ratliff was instructed how to properly maintain a memo book, in which police officers are required to compile a record of their daily activities such as contact with citizens, arrests made, citations issued, field interrogations and the like.

Captain Raymond Beste, a defendant herein, was the commanding officer at the Police Academy during Ratliff's training period. The Police Academy was staffed by a number of sergeants, each of whom was responsible for instructing the trainees in a particular course of study. Defendant Charles R. Figer was the sergeant who taught report writing to Ratliff while she was at the Academy. Sergeant Orval Zellmer was the class administrator at the Academy.

Students at the Academy were evaluated at four separate times, the first evaluation recorded on November 24, 1978 (Defendants' Ex. 8). Ratliff's first evaluation was generally average in the various skills and attitudes rated. In the area of report writing, however, the evaluating officer indi-

cated that Ratliff's reports were often incomplete; that she lacked the ability to make clear, understandable reports; and that there was much room for improvement in spelling, word usage and completeness. Sergeant Figer made the following comments with respect to Ratliff's report-writing ability:

> This officer will have to make significant progress in writing reports. She has problems in the area of spelling, word usage, verb tenses, and filing complete information. If progress is not evident by the 8th week evaluation, I would not recommend that she be continued as a recruit. (Defendants' Ex. 8–C).

In addition to these comments, Sergeant Zellmer recorded two minor infractions committed by Ratliff. On the positive side, the evaluation noted that she scored 87 on the Rules and Regulations examination. The overall recommendation was that she be continued at that time as a trainee.

Captain Beste discussed Ratliff's first evaluation with her on November 24, 1978. Beste described the meeting as cordial and Ratliff's attitude as good. Subsequent to the meeting, Beste made the following comments at the end of the evaluation:

> On Friday, 11–24–78 I discussed this report with Recruit Officer Beverly J. Ratliff. I explained the importance of report writing in Police work. Recruit Ratliff was informed that she would have to make a significant improvment [sic] in her writing if she is to complete the course successfuly [sic]. I also instructed her to see Sergeant Figer to pick up some of the self study material and advised her that she would have to spend a considerable amount of effort to improve. (Defendants' Ex. 8–C).

Ms. Ratliff testified on direct examination that, during their meeting, Captain Beste had asked her if she had graduated from high school and asked "Did they have such a thing as English for you people?" and "What kind of schools do they have for you people?" (Tr. Vol. I, p. 20). She further testified that Beste told her that she was unqualified and should not be at the

Police Academy because there were people better qualified than she who had been waiting for admission for a long time. Plaintiff stated that Captain Beste never considered her Recruit Officer Ratliff, but addressed her as "you people" or "your kind" (Tr. Vol. I, p. 21).

On the day of her meeting with Captain Beste, Ratliff began to keep notes of certain experiences she had as a trainee and officer with the Police Department. A compliation of these experiences, gathered from her original notes, was admitted into evidence as Plaintiff's Exhibit #1. Ratliff testified that Plaintiff's Exhibit #1 was prepared at the request of the Milwaukee Police Association for use in future arbitration hearings. She further testified that her original notes had been destroyed in a fire. Thus, according to her own testimony, she began keeping a written record of certain experiences she had as a police trainee and officer little more than three weeks after her matriculation at the Academy. It is ironic that the first page of her record, which describes the meeting with Captain Beste regarding accurate report writing, begins with the date of that meeting which is erroneously recorded as having occurred on November 24, 197*9*.

The second evaluation period closed on December 22, 1978. Again, Ratliff's evaluation was average in most categories—unremarkable, but not deficient. There were several categories, however, in which she received negative assessments. She had been reprimanded twice, once for not being properly equipped—no call box key—and once for failing to have an assignment in on time. Sergeant Marcellus Cieslak, the firearms instructor, commented that Ratliff had not received a passing score in the firearms training program. Sergeant Figer wrote that Ratliff still was not proficient in her report writing, that she had shown some improvement since the first evaluation, and that she had accepted his suggestion that she write extra reports and review them with him. Figer opined that "continued improvement could bring her to acceptable levels in this area" (Defendants'

Ex. 9–9C). The second evaluation also indicates that Ratliff failed her Criminal Law exam with a score of 65.

Following her second post-evaluation meeting with Captain Beste, he reported that Ms. Ratliff had a positive attitude and that she hoped to improve in her weak areas. However, Beste recorded having reservations about Ratliff and her ability to function as a patrol officer. He noted her deficiencies in report writing, academics, and firearms and questioned her ability to perform in these areas under pressure.

The third evaluation period concluded on January 19, 1979. In the report of that date, Ratliff once again received average marks in most categories. One remarkable exception, however, is that she was characterized as having a total lack of ability to interpret or make reports (Defendants' Ex. 16). The evaluation still carries her Criminal Law test score as 65 although she had retaken the exam and passed it (Defendants' Ex. 17). She apparently received passing scores on her other academic tests. Sergeant Cieslik reported that Ratliff remained deficient in her firearms skills. Sergeant Figer stated that Ratliff was unable to file a complete and accurate report, and recommended that she not be continued as a recruit police officer.

On January 24, 1979, Sergeant Zellmar submitted to Inspector Ziolkowski, the Director of the Police Academy and Special Services, a special report on the training progress of Recruit Ratliff. It recounted her deficiencies, particularly with respect to her ability to understand instructions and to concentrate. He felt that these problems manifested themselves particularly in report writing and firearms training. He concluded his report by stating that Ratliff had not met the requirements of recruit training and was not capable of performing as a police officer (Defendants' Ex. 17A).

Sergeant Figer also submitted a report on Ratliff's training progress, particularly with respect to her report writing and memo book recordation (Defendants' Ex. 19–19F). In addition, Sergeant Cieslik submitted to the Inspector a separate report on her firearms proficiency (Defendants' Ex. 18–18A). Both reports were highly critical of her performance and concluded that she did not meet Academy requirements. However, in a follow-up memo (Defendants' Ex. 20) to the Inspector on February 19, Figer noted her additional practice reports, stated there had been marked improvement, and said:

> "In view of this improvement, I would reserve any further judgment of her ability to perform her duties as a police officer until she has completed her two weeks of field training."

## III. *Field Training: Ever Ward Incident*

On February 12, 1979, Ratliff began a two-week period of field training at the Fifth District. She worked under the direct supervision of her field training officer, David A. Richardson, a white male who was a regularly assigned police officer. Ratliff's field training sergeant at the Fifth District was Phillip Eccher, a white male.

On the evening of February 14, 1979, Ms. Ratliff, Officer Richardson, and Police Officer Fred Manson were at the intersection of 12th and Burleigh in the City of Milwaukee. While in the process of investigating a battery complaint then, Ratliff observed the battery suspect, a black male, throw an object behind a nearby building. Ratliff restrained the suspect while Manson retrieved the discarded object—a bottle of pills. A crowd began to gather in the area while Ratliff and Manson attempted to handcuff the suspect. Officer Richardson called for additional police officers to assist due to the gathering crowd and because the suspect was resisting arrest.

After the suspect had been handcuffed and the paddy wagon arrived, two black females approached Ratliff and Manson and protested that the suspect was being hurt. By this time, at least forty people had gathered in the area. Several police officers, including Officer William Fadrowski, assumed crowd control positions and began to move people off the street onto the sidewalk. Ever Ward, a black female

who was related to the battery suspect, became extremely vocal and resisted Fadrowski's efforts to clear the street. As Fadrowski attempted to push her to the sidewalk, Ever Ward struck him in the face.

There was conflicting testimony as to what happened next. Ratliff testified that, after being hit, Fadrowski screamed "that black bitch struck me" (Tr. Vol. I, p. 41–42). Ratliff further testified that Fadrowski then grabbed Ever Ward, flipped her onto the ground, and sat on top of her while beating her. Officer Lawrence Morris, a black male who was assisting with crowd control, testified that Fadrowski jumped on Ever Ward and began beating her. Morris testified that he did not hear Fadrowski make any comments during the episode. Fadrowski testified that he did not strike Ever Ward and that he did not say "that black bitch struck me" (Tr. Vol. VI, p. 15). Fadrowski also testified that both he and Ever Ward fell to the ground while he was trying to arrest her.

Officer Morris and Officer Carl Jives lifted Fadrowski off of Ever Ward, who was then arrested and placed in the paddy wagon. Following the incident, Ratliff, Richardson and Manson returned to the Fifth District station. Ratliff informed her superior officers at the Fifth District that Fadrowski had used excessive force in arresting Ever Ward. Ratliff testified that her superior officers seemed only to be interested in discovering which officer had "interfered with" Ever Ward's arrest (Tr. Vol. I, p. 45).

Later that night, Ratliff was directed to write a report—a "matter of"—regarding the Ever Ward incident. Officer Richardson accompanied her to a room in the Fifth District station where Ratliff wrote the report. Ratliff testified that Richardson took the report she had prepared out of the room, and that he returned a short time later and told her that she would have to change her report because her superiors didn't want it. She testified that Richardson told her that police officers must "stand together as brothers" (Tr. Vol. I, p.

46). Ratliff testified that she then completed a second report and handed it to Richardson, who left the room again. When he returned, she said that he told her to rewrite the report a third time, leaving out the part about Fadrowski beating Ever Ward. Ratliff also testified that Richardson told her she would be "marked for the rest of her stay in the police department" for having told her superior officers what she had seen (Tr. Vol. I, p. 50).

Richardson testified that he did not take Ratliff's reports to any of the supervising officers at the Fifth District. Richardson further testified that he told Ratliff to revise her reports because they contained numerous grammatical errors, not because of the substance of the reports. Richardson also denied having told Ratliff that police officers must stand together.

Officer Morris testified on direct examination that Sergeant Eccher ordered him to revise his report on the Ever Ward incident:

"As I proceeded to write these particular matter of's regarding the situation I was ordered by Sergeant Eccher that this is not what he wanted to hear. This is not what he wanted to see to the actual report. So he told me to delete part of the matter of that I had written." (Tr. Vol. VII, p. 71).

On cross-examination, however, Morris testified that Eccher had not dictated the contents of the report, but had instead told him to answer certain questions that Eccher had posed:

**The Court:** So that the factual grist of it, what was in the report wasn't dictated in any fashion by the Sergeant then, is that correct or am I wrong?

A. Not my answers.

Ratliff testified that Sergeant Eccher ordered her to include a final paragraph on the third matter of what she wrote concerning the Ever Ward incident. This paragraph reads as follows:

"At no time, in my opinion, did I feel that P.O. William Fadrowski lost control or used any unnecessary force to effect this arrest." (Plaintiff's Ex. 2).

Officer Richardson testified that this sentence was included in the first report written by Ratliff and that neither he nor any of the supervisory officers ordered her to include this statement in any of the drafts she had written.

Officer Morris received an official reprimand as a result of the Ever Ward incident. No civil charges were filed against Officer Fadrowski, but Fadrowski did initiate a civil action against Ever Ward to recover damages for injuries she had inflicted on him.

Ratliff testified that Sergeant Figer obtained copies of all of the reports she had written while on field training, including the "matter of" she satisfactorily completed on the Ever Ward incident. Ratliff also testified that Figer made the following remark during a class at the Academy following field training: "Beverly had learned a lot of things that maybe she shouldn't have" (Tr. Vol. I, p. 73–74). Figer testified that, while he did have conversations with Sergeant Eccher during Ratliff's field training period, he did not learn of the Ever Ward incident until plaintiff's first arbitration hearing.

Captain Beste testified that he had no knowledge of the Ever Ward incident until after Ratliff had been terminated by the Police Department. Plaintiff failed to establish that any of her superior officers at the Third District, where she was eventually assigned, knew of the incident prior to her termination. In fact, Lieutenant Edward Kondracki and Captain Joseph Kalivoda, plaintiff's superior officers at the Third District and defendants herein, both testified that they had no knowledge of the Ever Ward incident prior to Ratliff's termination by the Police Department.

On February 23, 1979, Ratliff completed her field training. Her field training evaluation report was generally average if not slightly above average in most categories rated. Officer Richardson included the following comments on his report:

"She has considerable lack of knowledge in the fundamentals of grammar, spelling and sentence structure. She was able to write good reports only after spending a great deal of time on them. With a concentrated effort in this area she could become a good police officer." (Plaintiff's Ex. 20).

Sergeant Eccher made similar comments on the field training evaluation regarding Ratliff's report writing skills.

## IV. *Final Evaluation*

The final evaluation period concluded on March 1, 1979. Once again, Ms. Ratliff received average marks in most of the categories. Her firearms score, however, was listed as 64.42, and her Traffic Law examination score was 64.09. Sergeant Figer made the following comments on the evaluation:

"Officer Ratliff made a concentrated effort following the 12th week evaluations to upgrade her report writing abilities. I still feel at this time that reports will continue to give her a great deal of trouble. It will be necessary for her to continue her efforts to improve." (Plaintiff's Ex. 20).

The following comments were made by Captain Beste at the conclusion of the evaluation:

"P.O. Ratliff is very marginal in her ability to write reports but she has displayed a great deal of extra effort in attempting to improve. For this reason we have withheld a recommendation pending her performance during her probationary period." (Plaintiff's Ex. 20).

Captain Beste was asked during the trial why, if Ms. Ratliff's report writing skills were below passable level, she was permitted to graduate. Beste stated that:

"She was making progress with the extra help, and the extra reports she was writing, and we felt that if she continued to do this, as a matter of fact, we told her, in the final evaluation, if she continued to do extra work as she had been, she would be able to successfully complete her probationary career." (Tr. Vol. IV, p. 26).

Prior to her graduation from the Academy, Ratliff had a conversation with Ser-

geant Figer in which she requested that her name be withdrawn from the list of those who had volunteered for jeep checker assignments ·following their graduation. Ratliff testified that Figer told her that he had not turned in the list of volunteers for jeep checker yet. Figer testified that he told Ratliff that the names had already been submitted.

### V. *Probationary Period At The Third District*

On March 2, 1979, Ms. Ratliff graduated from the Milwaukee Police Academy and shortly thereafter began her employment as a probationary police officer at the Third District. Captain Kalivoda was the commanding officer at the Third District, and Lt. Kondracki was the shift commander for the third shift from midnight to 8:00 a.m. Ms. Ratliff was assigned to the third shift as a jeep checker, her primary responsibilities being checking for parking and traffic violations as well as maintaining contact with citizens she encountered on the street.

On March 8, 1979, Kondracki met with the probationary officers assigned to the Third District. Kondracki explained to the new officers the nature of their duties and stressed the importance of field interviews, which involve stopping and talking to citizens on the street. Kondracki told the new officers that, while there were no particular quotas for field interviews, an average number would be five per shift or one hundred per month.

Field interviews, traffic citations, and all other reports written by police officers at the Third District are reviewed by the shift commander or by one of the sergeants if the shift commander is busy. On March 22, 1979, Lt. Kondracki examined a traffic citation issued by Ms. Ratliff on the previous day (Defendants' Ex. 32). The citation contained numerous errors, such as an incorrect deposit amount and an indication that the offense was both a state and local violation. In addition, Ratliff failed to include the driver's race and license expiration date, as well as the fact that an accident had occurred. Kondracki noted these errors in his report to Captain Kalivoda

dated March 22, 1979, in which Kondracki also stated that he had informed Ratliff of the importance of accurate citation and report writing (Defendants' Ex. 31). In light of these errors, Kondracki assigned Sergeant Anton Brinza to spend as much time as possible giving additional training to Ms. Ratliff.

On March 29, 1979, Lt. Kondracki submitted another report to Kalivoda concerning an accident report filed by Ratliff the preceding day (Defendants' Ex. 33). Kondracki listed eleven errors contained in the accident report and instructed Ratliff to make the appropriate corrections. Ratliff's amended report contained five errors which Kondracki listed in his follow-up report to Kalivoda (Defendants' Ex. 33A). Kondracki concluded his second report by stating that "P.O. Ratliff seems to be slow to learn and did not seem to take my instructions seriously." *Id.*

On April 2, 1979, Sergeant Witkiewicz ordered Ms. Ratliff to write a "matter of" explaining why she had a relatively low number of field interviews for the month of March. Ratliff stated in her report that she did not file more field interviews because she "did not fully understand on which persons" she should write the field interviews (Defendants' Ex. 38). Ratliff gave the same explanation to Kondracki when he met with her regarding her field interview output. In his written report following their meeting, Kondracki stated that other probationary officers had submitted 67 and 79 field interviews each for the same period (Defendants' Ex. 39). Ratliff's total for the month of March was 23 (Plaintiff's Ex. 25).

Ms. Ratliff was ordered to meet with Lt. Kondracki on several occasions in the initial months of her probationary period to discuss the number of night parking citations she had issued. At that time, the City of Milwaukee had a night parking ordinance in effect which prohibited parking without a permit on city streets during certain night and early morning hours. The parking ordinance was not in effect on Saturday nights and Sunday mornings,

however. On April 25, 1979, Ms. Ratliff wrote a "matter of" describing an incident which occurred on the previous Saturday night when she had issued numerous parking citations. She stated in the "matter of" that she did not recall having been told not to issue parking citations on Saturday night (Defendants' Ex. 42). Ratliff testified that she issued the parking citations on that particular Saturday night due to the pressure Kondracki had put on her to increase the number of citations she issued. Ratliff also testified that Kondracki ordered her to include a sentence in her "matter of" stating that she did not know about the Saturday night exception to the parking ordinance. Kondracki denied having ordered her to include that sentence.

As a result of this incident, Kondracki contacted Sergeant Figer at the Police Academy to determine whether police recruits were instructed not to issue parking citations on Saturday nights. Sergeant Figer sent Kondracki a copy of a handout given to recruits which describes the night parking ordinance in detail, including those days on which it is not in effect (Defendants' Ex. 186). Kondracki testified that a copy of the night parking ordinance was posted throughout the Third District station.

On April 25, 1979, Ms. Ratliff filed an accident report which was later reviewed by Lt. Kondracki. Kondracki circled several errors and omissions in the report (Defendants' Ex. 45–45A). Ratliff revised the report and submitted it to Kondracki, who showed her how to correct her diagram so that it would be accurate and complete (Defendants' Ex. 47–47A). Ratliff then submitted a third report with the corrections made and the diagram completed according to Kondracki's instructions (Defendants' Ex. 47B–47C).

On April 30, 1979, Ratliff reported for work without her riot gear, in violation of a police department rule. In her report on this incident, she stated that the riot gear was in her car, but that her car would not start so she used her father's car (Defendants' Ex. 48). Ratliff testified that she had

been told by Sergeant Figer that she could go to her home and pick up her riot gear anytime she needed it if she lived within the district where she worked. She also testified, however, that she did not live within the Third District.

On May 1, 1979, Lt. Kondracki filed a report in which he stated that Ms. Ratliff had issued only 44 parking citations during her eight hour shift on April 30, 1979. Kondracki concluded that the 44 citations represented two hours of work at most, and that she was inactive during the remaining six hours because she received no other assignments that night. Kondracki further remarked that 7 of the 44 citations contained "careless errors" (Defendants' Ex. 50).

The following day, Lt. Kondracki examined Ms. Ratliff's memo book and found that she had not recorded the numbers of several citations she had issued. Lt. Kondracki had specifically instructed Ms. Ratliff a month prior to that time that she was to record all activity, including citation numbers, in her memo book.

Ratliff was ordered to write a "matter of" on May 2, 1979, explaining why she had not issued any traffic citations for a period of seven days during April and May of 1979. Ratliff stated in her report that she was parked near the intersection of 27th and Wisconsin on those days, but that she did not see any traffic violations (Defendants' Ex. 57–57A).

Ms. Ratliff investigated an individual on May 5, 1979, and was ordered to write a report on her investigation. She took the report to Lt. Kondracki who found spelling and grammar errors and ordered her to rewrite it. Kondracki also told Ratliff to return the original report along with the rewritten report. Ratliff returned to Kondracki's office with the second report, but told him that she had accidentally torn up the original. Kondracki found the original report in a wastebasket and observed that it was torn in many pieces (Defendants' Ex. 65–65B), while a different report that Ratliff had written was torn into only four pieces (Defendants' Ex. 65C).

Kondracki later questioned Ratliff in an effort to determine how she had actually torn the original report. In his report on the incident, Kondracki concluded that Ratliff must have torn the original report separately from the others she had thrown away and that she had intended to prevent that report from being included in her file (Defendants' Ex. 64A). Kondracki went on to recite numerous problems associated with Ratliff's performance during her assignment at the Third District, and stated at the conclusion of his report that Ratliff had "made no improvement since assigned to the district and seems to lack any potential for improvement" (Defendants' Ex. 64B–64C).

On May 13, 1979, Kondracki ordered Ratliff to write a "matter of" regarding a discrepancy between the number of parking citations she reported on her April activity sheet (283) and the number district records indicated she had issued (approximately 183). Ratliff stated in the "matter of" that she had found the onionskin copies of 55 of the missing citations at home, but that she had put them in the garbage (Defendants' Ex. 63–63A). Ratliff could not account for the remaining missing citations.

On May 15, 1979, Ms. Ratliff was called to Captain Kalivoda's office along with Lt. Kondracki and Sergeant Edmond Majkowski. The purpose of the meeting was to discuss the various problems Ratliff was encountering in her duties. Ratliff told Kalivoda that Kondracki had been putting a great deal of pressure on her and that there was a communication problem between them. Ratliff testified that she also told Kalivoda that she had been forced to stay in Kondracki's office for long periods of time and that he refused to let her leave to use the bathroom. Ratliff asked Kalivoda to reassign her to a squad car so that she could work with veteran officers and gain more experience. Kalivoda subsequently reassigned Ratliff to a squad car.

On July 3, 1979, Ms. Ratliff and Officer Kenneth Meuler were dispatched to investigate an accident at 3218 W. Lisbon Avenue in the City of Milwaukee. Ratliff filed a report on the accident, which is in evidence as Defendants' Exhibit 129, 129A, 130 and 130A. Sergeant Witkiewicz reviewed Ratliff's accident report and wrote a "matter of" detailing the numerous errors contained in Ratliff's report. Among the errors Witkiewicz listed were the following: incorrect date and time of the accident; incorrect designations for damage to the vehicles; an indication that there was an occupant in one of the vehicles—a parked car—when in fact that car was unoccupied; a diagram which shows the wrong location of the streets where the accident occurred; and a scribbled name of the driver of one of the vehicles involved (Defendants' Ex. 128–128A). Witkiewicz also noted that it took Ms. Ratliff approximately three hours to complete that accident report, when it should have taken much less time. *Id.*

In following up on his review of her report, Witkiewicz checked Ratliff's memo book on July 6, 1979. He found that she did not have a complete entry concerning the accident on July 3, and that there was insufficient information reported for July 4 and 5 as well. When Witkeiwicz confronted Ratliff about her incomplete memo book, she told him that she needed to obtain information from her partner about the accident on July 3 before she could complete her memo book entry. No explanation was offered for the incomplete entries for July 4 and 5.

On July 19, 1979, Sergeant Witkiewicz wrote a report stating that Ms. Ratliff had written only six parking citations in a period of one hour and ten minutes. Witkiewicz compared Ratliff's output with that of officer Michael McCullough, who possessed a similar amount of experience as Ms. Ratliff and who was assigned similar duties. In the course of his shift, McCullough answered four assignment dispatches, made four speeding arrests, issued one warning card, issued two moving citations, made one other arrest and wrote forty-six parking citations (Defendants' Ex. 149). In the same amount of time, Ratliff answered five assignment dispatches, issued one equip-

ment violation citation, and issued six parking tickets.

On July 22, 1979, Sergeant Witkiewicz filed a report in which he summarized a number of problems he had observed with respect to Ms. Ratliff. Witkiewicz concluded his report by stating:

"This officer shows a pattern of incompetence that is unparalleled in my experience as an officer, and Sergeant-supervisor on the Milwaukee Police Department. There is not another officer with her amount of time that has so many problems as this officer in such a period of time. She just does not improve herself and training seems for naught. I feel for the good of the service and the officer's own good, her employment should be terminated." (Defendants' Ex. 154(B).

One of the final incidents which precipitated Ms. Ratliff's termination from the Milwaukee Police Department occurred on July 25, 1979. On that date, Lt. Kondracki observed several officers in the station assembly area updating their memo books prior to roll call. Kondracki testified that police officers were required to report to work eighteen minutes prior to their tour of duty, for which they were paid. Officers were expected to spend that time studying bulletins of recent crimes, copying down descriptions of suspects, and updating their hot car sheets. Kondracki noticed that Ms. Ratliff was not engaged in these activities, but was instead smoking a cigarette.

During roll call that night, Kondracki read the description of a man suspected of having killed a police officer. Kondracki testified that he saw all of the officers writing down the description, with the exception of Ms. Ratliff.

Following roll call, Kondracki called Ratliff and Sergeant Kasper into his office. Kondracki checked Ratliff's memo book and found that it was several days behind. Kondracki testified that Ratliff had not cancelled past bulletins, nor had she obtained bulletins for the past several days. When Kondracki asked to see her hot car sheet, Ratliff replied that it was in her car and left his office to retrieve it. She did not have her hot car sheet with her when she returned.

At that point, Kondracki asked Ratliff whether she had sought to obtain another officer's hot car sheet when she left Kondracki's office. Ratliff refused to answer his question, stating that she had freedom of speech. Kondracki then told Ratliff to file a report on that incident and to prepare herself for her tour of duty.

On July 29, 1979, Captain Kalivoda prepared a report recommending that Ms. Ratliff be terminated as a probationary officer with the Milwaukee Police Department. Kalivoda set forth a list of mistakes Ratliff had made during her probationary period, including her report writing errors, citation errors, her failure to properly maintain her memo book, and so forth (Defendants' Ex. 174–174G). Kalivoda also reported three traffic violations committed by Ratliff while she was on duty (Defendants' Ex. 174G).

Kalivoda testified that, in preparing his report, he relied upon all of the reports pertaining to Ms. Ratliff which were collected during her probationary period, including her Academy evaluations and her statement given to Lt. Kondracki on July 12, 1979 (Defendants' Ex. 142). Kalivoda forwarded his recommendation to Inspector Robert Ziarnik along with a collection of Ms. Ratliff's reports and citations. Ratliff testified that these reports and citations represented approximately 5% of those she had written during her probationary period.

On August 10, 1979, a Board of Inquiry found Ms. Ratliff unfit for the performance of her duties and recommended that she be terminated. Police Chief Harold A. Breier acted upon the Board's recommendation that same day and terminated Ratliff's employment.

Following Ms. Ratliff's termination, a hearing was held before the Wisconsin Department of Industry, Labor and Human Relations on Ratliff's claim that she had been discriminated against on the basis of

race and sex in violation of the Wisconsin Fair Employment Act, Wis.Stat. § 111.31–111.37. The Hearing Examiner found that the complainant had failed to present a prima facie case of discrimination and dismissed the complaint (Plaintiff's Ex. 207). Pursuant to a collective bargaining agreement between the City of Milwaukee and the Milwaukee Police Association, a hearing was also held before an arbitrator to determine whether Ms. Ratliff had been discharged in violation of the collective bargaining agreement. The arbitrator found that Ratliff had been terminated without cause and ordered her reinstatement with back wages (Plaintiff's Ex. 6 and 7). The arbitrator's award was subsequently vacated by the Circuit Court of Milwaukee County.

## VI. *Plaintiff's Testimony*

The defendants' case was well documented, consisting of a multitude of reports, traffic citations and evaluations collected during the period of Ms. Ratliff's employment. The defendants also produced a number of witnesses whose testimony was, in general, that Ms. Ratliff's termination was entirely justified and not based on considerations of race or sex.

In contrast, the plaintiff relied primarily upon her own testimony and, in relation to the Ever Ward incident, upon that of Officer Morris in order to support her allegations. As such, Ms. Ratliff's testimony was largely unsupported. Her case depended upon the Court believing her version of several incidents which she recalled as opposed to the testimony of defense witnesses.

The Court has already discussed Ms. Ratliff's account of the Ever Ward incident. Much of her testimony was directly refuted by defense witnesses, particularly by David Richardson who denied having told Ratliff that she must alter the substance of her report. Richardson was no longer a police officer at the time of the trial, a fact which lends greater credibility to his testimony. The testimony of Lawrence Morris, plaintiff's witness, also failed to substantiate Ratliff's account of the incident in certain respects. Even though Morris stood only a few feet away from Officer Fadrowski during the arrest of Ever Ward, Morris did not hear Fadrowski during the arrest of Ever Ward, Morris did not hear Fadrowski make the racially oriented statements which Ratliff claims he made. Morris also testified that he answered certain questions Sergeant Eccher posed to him in his own words in his report on the incident.

The relationship which the plaintiff attempted to draw between the Ever Ward incident and her treatment at the Third District, culminating in her termination, was simply not supported by the evidence at trial. Sergeant Figer, Lt. Kondracki and Captain Kalivoda all testified that they knew nothing of the Ever Ward incident until after Ms. Ratliff had been terminated. Figer's remark that Ms. Ratliff learned a few things during her field training that she shouldn't have bears no direct correlation to the Ever Ward incident; it could have been directed to any one of a number of incidents that occurred during her training period. Even if Figer had known of the incident prior to Ratliff's graduation from the Academy, the evidence does not show that his information was passed along to Kondracki and Kalivoda. Kondracki's contracts with Figer were made in order to obtain specific information about the Academy training program and whether Ratliff received instruction concerning *Miranda* warnings and parking ordinances. The Court believes that the supervising officers at the Third District had no knowledge of the Ever Ward incident prior to Ms. Ratliff's termination from the Milwaukee Police Department.

Much of Ratliff's testimony concerned Lt. Kondracki and his treatment of her while she worked at the Third District. Ratliff testified that she was called into Kondracki's office almost every night she worked the third shift and that she generally stayed in his office for three to five hours at a time (Tr. Vol I, p. 82–83). Ratliff testified that Kondracki was often angry during these meetings, that he used profanity, that he stepped on her feet, that

he told her she should quit her job, that he referred to her as "your kind," and that he refused to let her leave to use the bathroom. Ratliff further testified about an experience in Kondracki's office when she had attempted to write down the title and date of a "matter of" on a piece of paper she pulled from her bra. According to Ratliff, Kondracki refused to let her record the information and twisted her arm in order to make her release the paper she was writing on.

Kondracki denied that he had ever used profanity in Ratliff's presence or that he used the words "your kind" in reference to her. Kondracki testified that Ratliff was usually in his office for no more than ten minutes at a time, that he did not refuse to let her use the bathroom, and that he never told her to resign.

It seems incredible to the Court that Lt. Kondracki would have been able to fulfill his duties as shift commander if he spent as much time with Ratliff as she claims he did. If Ratliff's estimate of the hours she spent in Kondracki's office was true, she could have spent no more than a few hours each night performing her own duties. In this respect, the Court finds Ms. Ratliff's testimony to be incredible. In addition, the Court notes that Ms. Ratliff gave a conflicting account of the arm twisting episode. She testified initially that Kondracki did not twist her arm behind her back, but instead had brought her "forward" so that she was "on an angle" (Tr. Vol. II, p. 174). She later testified that he did twist her arm behind her back (Tr. Vol. III, p. 23).

Ms. Ratliff also attributed some of the same remarks to different defendants. Ratliff testified that Kondracki asked her "What kind of schools do you people go to?" and that he referred to her as "your kind" and "you people" instead of considering her as "Police Officer Ratliff" (Tr. Vol. III, p. 35–36). Ratliff had previously given the following testimony with respect to Captain Beste:

"He never considered me "Recruit Officer Ratliff." When he spoke to me, he considered me as "You People," and also used a phrase, "Your Kind." (Tr. Vol. I, p. 21).

Both Kondracki and Beste denied having made such comments. The Court believes that these comments were more likely the product of Ms. Ratliff's imagination rather than a manifestation of racial prejudices held by Beste and Kondracki. For these reasons, the Court believes that Ms. Ratliff's testimony must be given far less weight than that of the other witnesses who testified.

## VII. *Title VII Claim*

The plaintiff contends that the defendants' actions give rise to five independent but related violations of law for which she is entitled to relief. The Court will first consider plaintiff's claim that she was discharged from her employment on the basis of race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*

■ The focus of the inquiry in a Title VII case is whether the employer treated the plaintiff employee differently because of his or her race, color, religion, sex, or national origin. *DeLesstine v. Fort Wayne State Hospital and Training Center*, 682 F.2d 130, 133 (7th Cir.1982). In enacting Title VII, Congress intended to make job qualification the determinative factor as to one's employment status, thereby making considerations such as race and sex irrelevant. *Id.*

In her amended complaint, the plaintiff alleged that she was treated differently by her superiors because of her race and sex, although much of the evidence at trial and her post trial briefs indicate that her primary claim is disparate treatment on the basis of race. In fact, the plaintiff adduced no evidence that she was treated differently by her superiors because of her sex. The Court will therefore consider her claim as one of disparate treatment on the basis of race.

■ In a disparate treatment case, the plaintiff bears the burden of proving that the defendant acted with the intent to discriminate. *International Brotherhood of*

*Teamsters v. United States,* 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In the most common situation, the plaintiff lacks direct evidence of the defendant's intent to discriminate, but may create a rebuttable presumption of discrimination by establishing the elements of his or her prima facie case, as set forth by the Supreme Court in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). These elements of the prima facie case, modified for the case where the employee alleges discharge on account of race, are: (1) that the plaintiff is a member of a racial minority; (2) that the plaintiff was qualified for the job she or he was performing; (3) that the plaintiff satisfied the normal requirements of his or her work; (4) that the plaintiff was discharged; and (5) after the plaintiff's termination, a non-minority was assigned to do the same work. *Flowers v. Crouch-Walker Corp.,* 552 F.2d 1277 (7th Cir.1977); *McDonnell Douglas Corp. v. Green,* 411 U.S. at 802, 93 S.Ct. at 1824.

Once the plaintiff's prima facie case has been established, the defendant bears the burden of producing some legitimate, non-discriminatory explanation for the employee's discharge. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981); *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). The defendant need not actually persuade the Court that the employee was discharged for the proferred reason; rather, defendant has met its burden if its evidence raises a genuine issue as to the reason for the employee's termination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

The final step in the *McDonnell Douglas* formula is reached when, following defendant's explanation for the discharge, the burden then shifts back to the plaintiff to show by a preponderance of the evidence that the defendant's explanation was merely a pretext, and that the employee's race was the real reason for the termination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825; *Burdine,* 450 U.S. at 252–253, 101 S.Ct. at 1093. The plaintiff need not prove that race was the sole reason for the discharge, but only that she or he would not have been discharged "but for" his or her race. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2579 n. 10, 49 L.Ed.2d 493 (1976).

■ While the well-worn *McDonnell Douglas* formula often serves as a useful device for analyzing the evidence and allocating the burdens of proof in employment discrimination cases, the Supreme Court recognized at the time it first enunciated the format that its applicability to various factual situations would vary. 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13. The Supreme Court's comments were directed particularly to the elements of the plaintiff's prima facie case which, as we have already observed, needed modification to comport with the issues raised in employee discharge cases. *See, Flowers, supra.* Although fine-tuning the elements of the prima facie case may be sufficient in many cases, it should be recalled that the entire *McDonnell Douglas* model was devised principally for the situation where the plaintiff's case rested on circumstantial evidence of intentional discrimination. Where the plaintiff presents direct evidence of intentional discrimination, there is no need for proof of each element of the prima facie case. *Bell v. Birmingham Linen Service,* 715 F.2d 1552, 1557 (11th Cir. 1982); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1017 (1st Cir.1979). In fact, direct evidence that the defendant acted with a discriminatory motive not only relieves the plaintiff from having to establish each element of the prima facie case, it imparts a correspondingly heavier burden on the defendant to rebut that evidence:

"Once an [illegal] motive is proved to have been a significant or substantial factor in an employment decision, defendant can rebut only by *proving* by a preponderance of the evidence that the same decision would have been reached even

absent the presence of that factor." *Bell v. Birmingham Linen Service*, 715 F.2d at 1557; *quoting Lee v. Russell County Board of Education*, 684 F.2d 769, 774 (11th Cir.1982).

In *Loeb v. Textron, Inc., supra,* the First Circuit Court of Appeals visualized three types of employment discrimination cases, distinguishing them by the character of the evidence presented. The first type of case is that in which the plaintiff presents purely circumstantial evidence of discrimination, thus requiring the court to infer that the employer intended to discriminate against the plaintiff. This type of case requires the plaintiff to prove each element, if disputed, of the *McDonnell Douglas* prima facie case. 600 F.2d at 1018. In the second type of case, the plaintiff relies primarily on direct evidence of discrimination. The court in *Loeb* stated that the *McDonnell Douglas* format may be disregarded under these circumstances and the evidence organized according to the best judgment of the court. *Id.* Finally, in the third category, the plaintiff's case rests largely on circumstantial evidence of discrimination, but includes also some direct evidence. In this last case, the First Circuit stated that "strict adherence to all elements" of the *McDonnell Douglas* formula was unnecessary, but that departure from that formula should be undertaken "cautiously." 600 F.2d at 1018–19.

Lest the foregoing discourse on the applicability of the *McDonnell Douglas* formula appear to be nothing more than a ponderous rehash of employment discrimination case law, the Court will now explain the relevance and necessity of the preceding discussion to the matter at hand. The defendants suggest in their posttrial brief that the *McDonnell Douglas* formula would provide an acceptable means of allocating the burdens of proof in this case. Under the *McDonnell Douglas* approach, defendants contend that the plaintiff has failed to establish a prima facie case of disparate treatment. Specifically, defendants argue that the plaintiff has not shown "that there were non-minority or male employes not ultimately terminated and who

nonetheless bore a similar pattern of poor work performance." (Defendants' Posttrial Brief, p. 28).

In reply, the plaintiff claims that the *McDonnell Douglas* prima facie case formula does not apply to the facts in this case. Plaintiff's reasoning is that her graduation from the Police Academy is sufficient evidence of her qualifications for the job she held, and that the "fungibility of police recruit positions" obviates the need to prove replacement by a particular white police officer. (Plaintiff's Posttrial Reply brief, p. 4).

It is unclear to the Court whether the plaintiff believes that the prima facie case elements should be entirely disregarded, or whether her contention is that the Court should simply disregard certain of the normal requisites in light of the facts of this case. The plaintiff's statement that police officers are a more or less fungible commidity is, at first glance, a logical and effective argument in favor of overlooking the requirement that she prove replacement by a white officer. However, the Court is not so certain that police officers are any more fungible than bricklayers, assembly line workers, or any of a number of other occupations where discharged employees have been held to the traditional *McDonnell Douglas* standards in order to prove their cases. Perhaps the relevant feature which distinguishes police work from other occupations is that police officers graduate as a class from an academy and are hired as a group, whereas other types of jobs are filled on an individual basis. This somewhat unique aspect of the police department's hiring process makes it difficult, if not impossible, to determine who was hired to replace a discharged officer.

The problem of identifying the plaintiff's replacement does not arise in this case, however, because the Court is convinced that it need not analyze the evidence here according to the rigid standards set forth in the *McDonnell Douglas* formula. Were it to do so, the Court would find that the

plaintiff had not established a prima facie case because she has not demonstrated that she satisfactorily performed the jobs she was assigned. Furthermore, the Court does not feel that the plaintiff demonstrated sufficient improvement in her report writing skills such that a finding could be made that she was qualified for police work. The plaintiff remained on probationary status during the period she was employed, during which time it was clear that her performance would be continuously monitored in order to ascertain her fitness for the job. Her graduation from the Academy was no guaranty that she was qualified for the position; if so, the need for a probationary period would evaporate. Moreover, the comments made by Captain Beste and Sergeant Figer on plaintiff's final evaluation at the Police Academy reveal that the plaintiff needed to improve her report writing skills before she could be considered a qualified police officer.

■■■ As the Court has stated, however, it will not hold the plaintiff to the strict requirements of the *McDonnell Douglas* prima facie model in this case, the reason being that a full hearing was held in this matter where both parties presented their cases in toto to the Court. The defendants put forth ample evidence of the legitimate, nondiscriminatory reasons for the plaintiff's discharge, far surpassing their normal burden of rebutting a prima facie case. As the Supreme Court stated in *Aikens:*

"Where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether the defendant intentionally discriminated against the plaintiff." [*U.S. Postal Service v. Aikens*] 460 U.S. [711] at 715 [103 S.Ct. 1478 at 1482, 75 L.Ed.2d 403]; *see also Jayasinghe v. Bethelehem Steel Corporation* [760 F.2d 132, 135] (7th Cir. 1985).

While relieved of the need to prove the elements of a prima facie case, the plaintiff continues to bear the burden of persuasion on the ultimate issue in this case, that is, whether the defendants intentionally discriminated against her on the basis of race. The Court will therefore consider the evidence presented in light of the plaintiff's burden of persuasion and the ultimate issue, ever mindful that it need only accord such weight as it deems appropriate to determinations made by the arbitrator and state hearing examiner. *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 37, 60, 94 S.Ct. 1011, 1014, 1025, 39 L.Ed.2d 147 (1974); *Garner v. Giarrusso*, 571 F.2d 1330, 1336 (5th Cir.1978).

■■ Having considered both the plaintiff's evidence of discrimination and the defendants' explanation for her discharge, the Court is convinced that the plaintiff's race was not a factor in the decision to terminate her as a probationary police officer. As the Court already noted, it found much of the plaintiff's testimony incredible, particularly that which would constitute direct evidence of discrimination. The Court does not believe that the plaintiff was kept in Lt. Kondracki's office for hours night after night, as she testified, nor does it believe her account of the so-called arm twisting incident. The inconsistencies in her testimony regarding the latter incident and the implausibility of her having remained for hours each night in a busy shift commander's office render such testimony incredulous.

The Court has also stated that it found the plaintiff's testimony about certain racial remarks allegedly made by Lt. Kondracki and Captain Beste to be suspect, primarily because the plaintiff attributed precisely the same words to both men. Both officers denied that they had made such remarks, and the Court finds them to be more credible witnesses than the plaintiff.

Much of the plaintiff's case consisted of indirect evidence of discrimination, the most critical aspect of which was her testimony about the Ever Ward incident. The Court has already discussed why it discredits the plaintiff's testimony about the

Ever Ward incident and the report she subsequently wrote on it, and that discussion need not be repeated here. It will suffice to note that the plaintiff failed to introduce any substantial evidence that Lt. Kondracki or Captain Kalivoda knew of the Ever Ward incident prior to the plaintiff's termination. The evidence that Sergeant Figer knew of the incident was sketchy at best, and is mostly irrelevant in light of the Court's finding that Figer never related anything about the Ever Ward incident to Kondracki or Kalivoda. Absent knowledge by Kalivoda and Kondracki about the incident, it could not have played a part in their decision to terminate her employment.

The plaintiff also contends that her assignment to the distasteful jeep checker position and the compilation of a "record" of her mistakes, which included perhaps only 5% of her written work, is evidence of the defendants' intent to discriminate against her. The Court does not believe that her assignment as a jeep checker was discriminatory in light of her initial request for that assignment and Sergeant Figer's testimony that the assignment had been made before the plaintiff notified him of her change of heart. There was apparently no reluctance on behalf of Captain Kalivoda to transfer the plaintiff to a different assignment when she later requested it, another fact which indicates that her assignment as a jeep checker was not done with the intent to discriminate against her.

As for the record kept of plaintiff's mistakes, the Court sees nothing unusual about an employer keeping track of a probationary employee's errors, especially when that employee produces such an abundant supply of errors to record. Had the plaintiff introduced evidence that she alone was the subject of such record keeping, the Court would find her argument far more persuasive. But even then she would be required to show that her mistakes were no more eggregious or consistent than other non-minority probationary officers whose mistakes were not recorded, which the plaintiff did not do. Furthermore, the plaintiff can scarcely complain about the record keeping tendencies of the defendants when she herself thought it necessary early on in her training period to begin recording her own version of her experiences.

Balanced against the plaintiff's evidence is the defendants' case: a long and well documented account of the plaintiff's shortcomings as a police trainee and probationary police officer. It is apparent to the Court that the plaintiff never mastered the art of report writing during the course of her employment; that she consistently filled out inaccurate or incomplete citations; that she was far below the norm in the number of field interrogations conducted and citations issued; and that she failed to properly maintain her memo book. In addition, the plaintiff demonstrated on one or more occasions a lack of attentiveness to department rules and local ordinances as well as a failure to undertake general preparatory activities expected of police officers prior to their tours of duty. In view of these facts, the Court finds an abundance of evidence in support of the defendants' contention that the plaintiff was terminated on account of her poor job performance. Accordingly, the Court finds that the plaintiff has not satisfied her burden of persuading the Court that she was intentionally discriminated against by the defendants and discharged from her job due to her race. Plaintiff's Title VII claim is therefore dismissed.

### VIII. *Plaintiff's Constitutional And Conspiracy Claims*

In her posttrial brief, the plaintiff sets forth three claims for relief based on alleged violations of her constitutional rights. These claims are: (1) deprivation of procedural due process rights remediable under 42 U.S.C. § 1983 and the indemnification principle of Wis.Stat. § 895.46; (2) denial of equal protection of the laws remediable under 42 U.S.C. § 1983 and the indemnification principle of Wis.Stat. § 895.46; and (3) a conspiracy to retaliate and punish free expression in violation of the First and Fourteenth Amendments and remediable under 42 U.S.C. § 1983 and the indemnifi-

cation principle of § 895.46. In addition, plaintiff claims that the defendants conspired to obstruct justice, for which the plaintiff may obtain damages under 42 U.S.C. § 1985(2).

Defendants contend that the plaintiff did not raise the four claims enumerated above in either the complaint or amended complaint. Defendant further contends that the plaintiff's attorney acknowledged at the final pretrial conference that this case was nothing other than a Title VII action. While the Court agrees that the plaintiff's case was founded primarily upon her Title VII claim, the Court also finds that the additional claims are contained in the amended complaint and therefore will consider the merits of those claims.

Before discussing the merits of plaintiff's remaining claims, however, the Court will first consider whether the plaintiff is entitled to seek relief under statutes other than 42 U.S.C. § 2000e *et seq.* Recent decisions by the United States Supreme Court and this Court indicate that the plaintiff's sole remedy for her employment discrimination cause of action would be under Title VII.

### A. *The Novotny Rule: Title VII Provides The Exclusive Remedy*

As the Court stated above, Congress passed Title VII in order to make employment discrimination on the basis of race, sex, color, religion and national origin illegal. *DeLesstine*, 682 F.2d at 133. While her approach is hardly a novel one, the plaintiff in this case has chosen to seek relief under other statutes in addition to 42 U.S.C. § 2000e *et seq.* For the following reasons, the Court believes that plaintiff's sole remedy for the alleged discriminatory actions of the defendants is provided by Title VII, and therefore will deny the additional claims brought by the plaintiff.

In *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 372, 99 S.Ct. 2345, 2349, 60 L.Ed.2d 957 (1972), the Supreme Court was faced with the question of whether a person who was injured by a conspiracy to violate § 704(a) of Title VII was also deprived of equal protection of the laws within the meaning of 42 U.S.C. § 1985(3). The Court held that, since § 1985(3) does not itself provide substantive rights, "it may not be invoked to redress violations of Title VII," which provides its own remedial scheme. *Id.* at 378, 99 S.Ct. at 2352. After pointing out some of the specific features of Title VII, including the requirement that administrative remedies first be sought, the provisions for equitable relief and recovery of attorney's fees, and the majority view that the statute prohibits an award of general or punitive damages, the Court went on to state why § 1985(3) did not provide suitable remedies for Title VII violations:

"If a violation of Title VII could be asserted through § 1985(3), a complainant could avoid most if not all of these detailed and specific provisions of the law. Section 1985(3) expressly authorizes compensatory damages; punitive damages might well follow. The plaintiff or defendant might demand a jury trial. The short and precise time limitations of Title VII would be grossly altered. Perhaps most importantly, the complainant could completely bypass the administrative process, which plays such a crucial role in the scheme established by Congress in Title VII." *Id.* at 375–376, 99 S.Ct. at 2350–2351.

Following the Supreme Court's reasoning in *Novotny*, this Court stated in *Torres v. Wisconsin Department of Health & Social Services*, 592 F.Supp. 922, 928 (1984), "that the remedial framework of Title VII could be just as effectively circumvented by a litigant suing under section 1983 as it could by a party seeking relief under section 1985(3)." The Court also quoted language from *Middlesex County Sewerage Authority v. Sea Clammers*, 453 U.S. 1, 20–21, 101 S.Ct. 2615, 2626–2627, 69 L.Ed.2d 435 (1980), wherein the Supreme Court stated that "when the remedial devices provided in a particular Act are sufficiently comprehensive, they may suffice to demonstrate congressional intent to preclude the remedy of suits under § 1983." *Novotny*, 592 F.Supp. at 929. Thus, this

Court declared that "where the plaintiffs' so-called constitutional allegations are so tied up with their cause of action under Title VII that they are, in the Court's view, nearly unidentifiable as discrete claims," Title VII provides the exclusive set of remedies for discrimination in employment. 592 F.Supp. at 930–931.

As in *Torres,* the Court believes that the plaintiff's § 1983 claims in this case are inherently bound up with her Title VII claim such that her sole remedy is provided by Title VII. The Court further believes that it will be embarking upon waters already surveyed, if not completely charted, if it extends the logic of *Torres* and *Novotny* to plaintiff's § 1985(2) claim as well. While the plaintiff may argue that the conspiracy, procedural due process, retaliation and equal protection claims pertain to distinct rights which are guaranteed under the Constitution, the Court feels that these claims are part and parcel of the same cause of action. Had the plaintiff not been terminated from her job or harassed in her employment situation as she contends, she would have no claim for damages for any of these other alleged constitutional and statutory violations. Each of her claims is premised upon her assertion that she was discriminated against because of her race, the very action that Congress intended to prohibit and provide a remedy for by means of Title VII. The Court concludes that Title VII provides the exclusive remedy for the allegedly discriminatory actions of the defendants in this case, and therefore dismisses plaintiff's claims for relief under § 1983 and § 1985(2).

The Court's decision to dismiss plaintiff's constitutional claims need not rest entirely upon its reading of *Novotny* and the application of its unappealed holding in *Torres,* however. The Court believes that the plaintiff's § 1983 and § 1985(2) claims should also be dismissed on their merits, and will therefore conclude this decision by addressing the merits of these claims.

### B. § 1983 Procedural Due Process Claim

The plaintiff contends that she was deprived of her procedural due process rights when she was terminated without a proper hearing. The plaintiff seeks relief against the individual defendants under § 1983 and against the City of Milwaukee under the indemnification principle of Wis.Stat. § 895.46.

Examination of a procedural due process claim involves a two step analysis. First, the Court must determine whether there is a protected interest at stake such that due process requirements even apply. *Board of Regents of State Colleges, et al. v. Roth,* 408 U.S. 564, 570–571, 92 S.Ct. 2701, 2705–2706, 33 L.Ed.2d 548 (1972). If there is a protected interest at stake, the Court must then determine what procedural requisites must be employed before that protected interest may be taken away. *Boddie v. Connecticut,* 401 U.S. 371, 378, 91 S.Ct. 780, 786, 28 L.Ed.2d 113 (1971); *Roth,* 408 U.S. at 570, 92 S.Ct. at 2705.

The Court need not proceed to the second step in this case because it finds that the plaintiff was not deprived of a constitutionally protected interest. The Fifth Amendment's Due Process Clause applies only to deprivations of "life, liberty or property." *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 656, 94 L.Ed. 865 (1950); *Boddie,* 401 U.S. at 378, 91 S.Ct. at 786. In this case, the plaintiff claims that she had a property interest in her job because she could be fired only for cause. The plaintiff also contends that her dismissal for the reasons proferred by defendants deprived her of a liberty interest without due process.

 Proceeding first under the property theory, it is the plaintiff's duty to show that she had "more than a unilateral expectation" of continued employment as a police officer. *Roth,* 408 U.S. at 577, 92 S.Ct. at 2709. Indeed, she must demonstrate that she had a "legitimate claim of entitlement" to her job. *Id.* In order to determine whether the plaintiff had such a legitimate claim of entitlement to her job, the Court must look to "existing rules or understandings that stem from an independent source such as state law." *Id; Bish-*

op v. Wood, 426 U.S. 341, 344, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); Logan v. Zimmerman Brush Co., 455 U.S. 422, 430, 102 S.Ct. 1148, 1155, 71 L.Ed.2d 265 (1982).

The Court directed itself to Wisconsin Statutes and case law in an effort to determine whether a basis exists for a probationary police officer's belief that she has a legitimate entitlement to continued employment. The Court has found no such basis. Instead, the Court found Kaiser v. Board of Police & Fire Commissioners of The City of Wauwatosa, 104 Wis.2d 498, 311 N.W.2d 646 (1981), in which the Wisconsin Supreme Court stated that a probationary police officer did not have "more than a unilateral expectation of fulfilling (his probationary period) and being hired as a permanent officer...." 104 Wis.2d at 505, 311 N.W.2d 646. The court in Kaiser also stated that the employment of a probationary police officer was controlled by Wis. Stat. § 165.85(4)(b), which provides in relevant part:

"(b) No person may be appointed as a law enforcement officer, except on a temporary or probationary basis, unless the person has satisfactorily completed a preparatory program of law enforcement training approved by the board and has been certified by the board as being qualified to be a law enforcement officer. The program shall include at least 240 hours of training. The specific curriculum of the 240-hour preparatory program shall be promulgated by the board as a rule under ch. 227. The rule shall ensure that there is an adequate amount of training to enable the person to deal effectively with domestic abuse incidents. The period of temporary or probationary employment established at the time of initial employment shall not be extended by more than one year for an officer lacking the training qualifications required by the board...." (Emphasis added.)

104 Wis.2d at 501–503, 311 N.W.2d 646. Finding nothing in § 165.85(4)(b) which would indicate that a probationary police officer has a legitimate entitlement to his job, the Wisconsin Supreme Court held that a probationary police officer was not entitled to a hearing or a statement of reasons upon termination. 104 Wis.2d at 506. This holding was subsequently followed by the Wisconsin Court of Appeals in Milwaukee Police Association v. City of Milwaukee, 113 Wis.2d 192, 335 N.W.2d 417 (1983). See also, Johnson v. University of Pittsburgh, 435 F.Supp. 1328, 1329, 1369 (W.D. Pa.1977).

Clearly, Wisconsin courts have concluded that state law provides no legitimate expectation of employment on behalf of a probationary police officer. In line with those decisions, this Court hereby finds that the plaintiff in this case did not have a protected property interest in her job, and that procedural due process provisions do not apply unless it is found that the plaintiff's termination deprived her of a protected liberty interest.

■■ Although seemingly a more categorical term than "property interest," the "liberty interest" principle is actually a more esoteric and encompassing phenomenon. Far from embodying merely the obvious connotation, that is, of or pertaining to one's physical capacity to move freely about, the term has been construed to apply to one's reputation as well. Roth, 408 U.S. at 573, 92 S.Ct. at 2707. Thus, if an employee is fired from a job under circumstances where the reasons for the discharge were publicized, those reasons being of an opprobrious nature, the damage done to the employee's reputation (i.e., the "stigma" imposed) may rise to the level of a liberty deprivation. Roth, 408 U.S. at 573, 92 S.Ct. at 2707.

■■ Doubtless, one's ego and reputation do not emerge unscathed in the aftermath of a forced termination from employment. Whether or not a hearing of some type is due prior to the termination of a public employee depends in part upon the effect such termination has on that employee's ability to seek new work. If, as a result of the termination, the discharged employee remains as free to seek new employment as he was before the stigma of

termination befell him, then there was no deprivation of his liberty interest. *Roth,* 408 U.S. at 575, 92 S.Ct. at 2708.

Even if the stigma imposed does impede the employee's subsequent job search, the employee is not entitled to a hearing upon termination unless the discharge was based on false and defamatory charges. *Codd v. Velger,* 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977); *Johnson v. University of Pittsburgh,* 435 F.Supp. at 1370. The Court recognizes that this requirement seemingly places the employee in a "Catch-22" situation, that is, no hearing need be provided unless the charges are false and defamatory, yet the employee cannot prove the charges to be false and defamatory unless a hearing is provided. However, the plaintiff in this case had her opportunity in the hearing before the Court to prove the false and defamatory nature of the reasons asserted for her discharge, and the Court has reached the opposite conclusion. Therefore, for this reason alone the Court may find that she was not deprived of a liberty interest because the reasons asserted for her dismissal were in fact the truth.

■ The publication of defendants' reasons for discharging the plaintiff is also an issue that concerns the Court in this case, though. There is no question that the plaintiff's termination and the subsequent trial before the Court received a fair amount of media attention. It follows that the reasons alleged by the defendants for her discharge are sufficiently well known that they may be considered public knowledge. However, there is no clear indication that the reasons for her discharge would have been made known to anyone other than those responsible for the decision to terminate her had the plaintiff not pursued this case at the state administrative level, at arbitration, and before this Court. Where the reasons for the discharge were not public knowledge until the commencement of judicial or similar proceedings, there was no deprivation of the employee's liberty interests which attended the termination. *Bishop,* 426 U.S. at 348–349, 96 S.Ct. at 2079–2080.

■ The Court concludes that because the charges made against her were essentially true, the plaintiff was not deprived of a liberty interest when she was terminated as a probationary police officer. The Court also finds that the plaintiff has failed to show sufficient publication of the reasons for her dismissal prior to the advent of judicial or similar proceedings, thereby depriving her of a liberty interest. For the reasons stated above, the Court finds that the plaintiff's termination deprived her of neither a liberty nor a property interest, and that she was not entitled to a hearing upon her dismissal. Plaintiff's procedural due process claim is accordingly denied.

**C. § 1983 Equal Protection Claim**

■ The plaintiff's third claim is that she was denied equal protection of the laws because the defendants intentionally discriminated against her on account of her race. Plaintiff contends that certain remarks made and the treatment she was given by Captain Beste, Sergeant Figer, Sergeant Majkowski, Lieutenant Kondracki and Captain Kalivoda constituted both direct and indirect evidence, respectively, of intentional discrimination against her.

In order to establish a violation of her equal protection rights, the plaintiff must prove that the defendants acted with a racially discriminatory purpose. *Washington v. Davis,* 426 U.S. 229, 245, 96 S.Ct. 2040, 2050, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). In this case, the plaintiff's equal protection claim rests on the credibility of her testimony as opposed to that of the defendants. The Court's view of the plaintiff's testimony with regard to remarks allegedly made by the defendants and their treatment of the plaintiff has been discussed at length above, and for the reasons stated above, the Court does not believe that the plaintiff has carried her burden of proof on the issue of intentional or purposeful discrimination. Therefore, the

Court hereby dismisses plaintiff's equal protection claim on its merits.

### D. § 1985(2) Conspiracy Claim

[17] The plaintiff's fourth claim is that Sergeant Figer, Lt. Kondracki and Captain Beste conspired to obstruct justice in the state system because of plaintiff's race in violation of 42 U.S.C. § 1985(2). This claim pertains to the Ever Ward incident and the alleged conspiracy between defendants Figer, Kondracki and Kalivoda to terminate the plaintiff for having reported that Officer Fadrowski physically abused Ever Ward.

Section 1985(2) allows for recovery of damages against those who violate the provisions therein, which are:

**(2) Obstructing justice; intimidating party, witness, or juror.** If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating in any manner, the due course of justice in any State or territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;

As such, subsection (2) can be divided into two parts, the first part pertaining to the administration of justice in the federal judicial system, and the second part relating to "conspiracies to obstruct the course of justice in state courts." *Kush, et al. v. Rutledge,* 460 U.S. 719, 725, 103 S.Ct. 1483, 1487, 75 L.Ed.2d 413 (1983). Thus, the second part of § 1985(2) encompasses "underlying activity that is not institutionally linked to federal interests and that is usually of primary state concern." *Id.*

A further distinction between the two components of § 1985(2) is that a violation of the second part requires a showing that the conspirators intended to deprive the injured party of the equal protection of the laws. *Id.; Stern v. United States Gypsum, Inc.,* 547 F.2d 1329, 1341 (7th Cir. 1977). No such animus requirement applies to the first part of § 1985(2). *Kush,* 460 U.S. at 726, 103 S.Ct. at 1488.

The plaintiff in this case is proceeding under the second part of § 1985(2), contending that she is entitled to relief under the statute because she was injured by the alleged conspiracy to cover-up Officer Fadrowski's actions. The plaintiff's argument fails for two reasons. First, even if it is assumed for the moment that there was a conspiracy to cover-up the actions of Officer Fadrowski, the plaintiff has no cause of action under § 1985(2) for injuries incurred by her as a result of that conspiracy. The second part of § 1985(2) has been construed to mean that it prohibits any conspiracy to obstruct a state judicial proceeding with the intent to deprive another of equal protection of the laws. *Kush,* 460 U.S. at 725, 103 S.Ct. at 1487. The cause of action under § 1985(2), if any, belongs to Ever Ward who conceivably was obstructed from pursuing a brutality claim against Fadrowski, if plaintiff's story is believed.

The plaintiff cites *Lenard v. Argento,* 699 F.2d 874 (7th Cir.1983), for the proposition that any person somehow injured as the result of a conspiracy to cover-up a police brutality incident has a cause of action under § 1985(2). However, *Lenard* does not stand for that proposition. The plaintiff in *Lenard* was himself the victim of a beating by police officers, 699 F.2d at 881–883; he was therefore, in a position more akin to that of Ever Ward than the plaintiff herein. The Court has found no authority for reading § 1985(2) as expan-

sively as the plaintiff would have it, and therefore finds that she is not an injured party entitled to relief under the second part of § 1985(2).

■■■■ The second reason for denying plaintiff's claim under § 1985(2) is that she failed to demonstrate the existence of a conspiratorial agreement between Figer, Kondracki and Kalivoda. While the plaintiff need not prove that Figer, Kondracki and Kalivoda each knew all of the details of the purported conspiracy or the identity of everyone involved in the alleged cover-up, the plaintiff must show that there was "a single plan, the essential nature and general scope of which (was) known to each person who is to be held responsible for its consequences." *Lenard,* 699 F.2d at 883, *quoting Hampton v. Hanrahan,* 600 F.2d 600, 620–621 (7th Cir.1979), *rev'd in part on other grounds,* 446 U.S. 754, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980). The Court has already stated its finding that neither Kalivoda nor Kondracki knew of the Ever Ward incident prior to plaintiff's termination. While the plaintiff did adduce some evidence that Figer was aware of the Ever Ward incident by February or March, 1979, the plaintiff's evidence was hardly conclusive and not sufficient to contradict Figer's testimony that he did not learn of the incident until 1980. Thus, the plaintiff failed to show that the defendants even knew of the Ever Ward incident prior to plaintiff's discharge, much less that they conceived of a plan to terminate plaintiff because of her actions relative to that incident. Plaintiff's § 1985(2) claim will therefore be dismissed for two reasons: (1) she has no cause of action under that statute; and (2) she utterly failed to prove the existence of a conspiratorial agreement.

### E. *§ 1983 First Amendment Retaliation Conspiracy Claim*

The plaintiff's fifth and final claim is that she was terminated as the result of a conspiracy by defendants Figer, Kondracki and Kalivoda to retaliate against her for reporting that Fadrowski had beaten Ever Ward. Plaintiff contends that defendants'

retaliatory conduct violated her constitutional rights under the First and Fourteenth Amendments and that she is entitled to relief under § 1983.

For the same reasons the Court found that the plaintiff failed to prove the existence of a conspiratorial agreement in violation of § 1985(2), the Court also finds that there was no conspiracy to retaliate against the plaintiff in violation of the First and Fourteenth Amendments. Absent proof that Figer, Kalivoda, or Kondracki knew of the incident, the Court cannot find that these defendants agreed to retaliate against the plaintiff on account of the incident.

■■■■ Even if the plaintiff had shown that these defendants knew all about the Ever Ward incident, it was incumbent upon her to prove that her discharge was the result of an unlawful scheme. The Supreme Court has emphasized the need to distinguish "between a result caused by a constitutional violation and one not so caused." *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 286, 97 S.Ct. 568, 575, 50 L.Ed.2d 471 (1977). The Court reasoned as follows:

"A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—even if the same decision would have been reached had the incident not occurred. The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against

him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision."

429 U.S. at 285–286, 97 S.Ct. at 575. Applying the Supreme Court's causation requirement to this case, the plaintiff's success on the merits of her retaliation claim depends on whether the evidence shows that she would not have been fired but for her having reported Officer Fadrowski's conduct to her superior officers at the Fifth District. Plaintiff cannot succeed simply by showing that the Ever Ward incident was on the minds of the defendants and that it played a part in the decision to terminate the plaintiff.

The plaintiff did not meet her burden of proving that she would not have been fired or discriminated against in her employment but for her part in the Ever Ward incident. The plaintiff's performance was, at best, marginal throughout the period of her employment as a police trainee and probationary officer, and the defendants provided ample proof of the legitimate reasons for her dismissal. The plaintiff presented no proof that the Ever Ward incident was the determinative factor in the decision to dismiss her. The plaintiff's fifth claim based on the First and Fourteenth Amendments and § 1983 is also dismissed.

### IX. *Conclusion*

For the foregoing reasons, the Court hereby:

(1) **DISMISSES** plaintiff's Title VII claim;

(2) **DISMISSES** plaintiff's procedural due process claim;

(3) **DISMISSES** plaintiff's claim that she was denied equal protection of the laws;

(4) **DISMISSES** plaintiff's claim that she was injured as the result of a conspiracy to obstruct the course of justice in the state system in violation of § 1985(2); and

(5) **DISMISSES** plaintiff's claim that defendants Figer, Kondracki and Kalivoda conspired to retaliate against her in violation of her constitutional rights under the First and Fourteenth Amendments.