Beverly J. RATLIFF,
Plaintiff-Appellant,

v.

CITY OF MILWAUKEE, Harold A. Breier, Raymond A. Beste, Joseph A. Kalivoda, Edward N. Kondracki, Charles R. Figer, and Edmund Majkowski, Defendants-Appellees.

No. 85–1946.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 5, 1985.

Decided July 9, 1986.

Walter F. Kelly, Sutton & Kelly, Milwaukee, Wis., for plaintiff-appellant.

Bruce D. Schrimpf, Asst. City Atty., Milwaukee, Wis., for defendant-appellees.

Before CUDAHY and RIPPLE, Circuit Judges, and WILL, Senior District Judge.*

WILL, Senior District Judge.

In this case, we must decide whether the district court's factual findings are clearly erroneous. The plaintiff, Beverly J. Ratliff, is a single black woman who was discharged from her job as a probationary police officer in the City of Milwaukee on August 10, 1979, nine and one-half months after she was hired and five months after she graduated from the Milwaukee Police Academy.

Ratliff brought this action asserting five independent but related causes of action. The plaintiff maintains that she was fired from her job because of her race or sex in violation of Title VII of the Civil Rights Act of 1964. 42 U.S.C. §§ 2000e–2000e–17. She makes four additional constitutional and conspiracy claims, the first three of which are remedial under 42 U.S.C. § 1983 and the indemnification principle of Wis. Stat. § 895.46: (1) that defendants fired her without an adequate hearing, depriving her of a liberty or property interest in her job without due process of law; (2) that defendants intentionally discriminated against her on account of her race, denying her the equal protection of the laws; and (3) that defendants conspired to fire her in retaliation for reporting an incident of police brutality to her supervisors and resisting efforts to cover it up, in violation of her First and Fourteenth Amendments right to free expression. Ratliff testified that she saw Police Officer William Fadrowski use unnecessary force when he beat a citizen, Ever K. Ward, during the course of Ward's arrest. The incident occurred during Ratliff's field training at the Fifth District. In addition, Ratliff makes a claim for damages under 42 U.S.C. § 1985(2). She contends that the defendants fired her because she first reported and then resisted attempts to cover up the beating of Ever Ward, which constitutes a conspiracy to obstruct justice with the intent to deprive Ratliff of the equal protection of the laws.

The district court found that Ratliff was terminated because of her poor performance on the job, not because the defendants intentionally discriminated against her on account of her sex[1] or race, and not because of her conduct in reporting and then resisting efforts to cover up alleged police brutality. Based on extensive findings of fact and conclusions of law, the district court dismissed all claims. *Ratliff v. City of Milwaukee*, 608 F.Supp. 1109 (E.D.Wis. 1985). We affirm.

## I

On her third attempt, Ratliff successfully passed all of the prerequisites for becoming a police trainee. She began her employment with the Milwaukee Police De-

---

* The Honorable Hubert L. Will, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The trial court treated her Title VII claim as a race discrimination claim because Ratliff put on no evidence that her supervisors treated her differently because of her sex. We agree.

partment as a trainee in a 20 week course at the Milwaukee Police Academy on October 30, 1978. In the latter part of February, 1979, just prior to her graduation from the Academy, Ratliff participated in two weeks of field training in the Fifth District. After her graduation from the Academy on March 2, 1979, Ratliff was assigned to the Third District, third shift, as a probationary employee. Her probation period was to extend through October 29, 1979, but she was terminated on August 10, 1979.

At the Police Academy, Captain Raymond Beste (a defendant) was the commanding officer, and Sergeant Charles Figer (also a defendant) was responsible for teaching the trainees how to write reports. In written and oral evaluations of the plaintiff both Captain Beste and Sergeant Figer, as well as others at the Academy, were critical of Ratliff's ability to perform as a police officer. She had extreme difficulty writing complete, clear and understandable reports, and had trouble with spelling, word usage and verb tenses. Though she graduated from the Academy, both Captain Beste and Sergeant Figer had continuing reservations about her ability to write police reports.

In the final evaluation, Figer noted that she had made a concentrated effort to improve, but he felt that "reports will continue to give her a great deal of trouble. It will be necessary for her to continue her extra efforts to improve." (Plaintiff's Ex. 20; 608 F.Supp. at 1116). Captain Beste noted that Ratliff had "very marginal" ability to write reports, but that she had "displayed a great deal of extra effort in attempting to improve. For this reason we have withheld a recommendation pending her performance during her probationary period." (Plaintiff's Ex. 20; 608 F.Supp. at 1116). Since those ultimately responsible for the decision to terminate Ratliff reviewed evaluations of the plaintiff and the reports from the Academy, and since Ratliff has accused Beste and Figer of making racist comments to her, we must determine whether the district court clearly erred in determining that Beste and Figer were not motivated by race discrimination.

During her two weeks of field training at the Fifth District, Philip Eccher was the filed training sergeant and David Richardson was the field training officer primarily responsible for Ratliff's training. It was during this period that Ratliff allegedly witnessed police officer William Fadrowski beat Ever Ward. She claims that Richardson and Eccher made her change her report of the incident, and that her resistance to complying with their orders led ultimately to her termination. The district court determined that the Third District officers who were responsible for deciding to terminate Ratliff has no knowledge of her involvement in the Ever Ward incident prior to her termination. We must determine whether this finding is clearly erroneous as well.

After her graduation from the Academy, Ratliff was assigned to the Third District. Captain Joseph Kalivoda was the commanding officer, and Lieutenant Edward Kondracki was the third shift commander. Her sergeant-supervisors at the Third District included defendant Edmund Majkowski, as well as Anton Brinza, and David Witkiewicz. Ratliff was assigned to the third shift as a jeep checker, responsible for parking and traffic violations and, like other police officers, for writing police reports and for maintaining contact with citizens she encountered on the street through field interviews.

When the first monthly reports on probationary employees were filed at the end of March 1979, it became apparent to Lieutenant Kondracki and Captain Kalivoda that Ratliff was having extreme difficulty meeting the standards required of police officers, especially in the area of report writing. Captain Kalivoda ordered Lieutenant Kondracki to keep track of Ratliff's shortcomings and to give her additional training. Lieutenant Kondracki instructed Sergeant Brinza to spend as much time as possible with Ratliff giving her remedial training in an effort to upgrade her report writing. Transcript of 2/8/83 at 23. By the end of July, 1979, Ratliff had not shown sufficient

improvement. Captain Kalivoda instructed Lieutenant Kondracki to take a statement from Ratliff and to go over with her the items which Kondracki had collected in her file as well as those items which Kondracki received from the Academy. Captain Kalivoda then prepared a report recommending that Ratliff be charged with unsatisfactory performance as a probationary employee. Based on that recommendation, Inspector Ziarnik made a recommendation to Chief Breier, who instructed the Inspector to prepare formal charges to be submitted to a Board of Inquiry. The Board recommended by a vote of 3 to 2 that Ratliff be terminated. Chief Breier fired Ratliff that same day.

Ratliff claims that both Captain Kalivoda and Lieutenant Kondracki recommended that she be terminated, in part, because of her race. She testified that they both made racist remarks to her and that Lieutenant Kondracki harassed her unmercifully during her stay at the Third District. Alternatively, she argues that they knew of her involvement in the Ever Ward incident, and that she was fired for reporting the alleged police brutality to her supervisors and for resisting the alleged cover up of that incident. We must determine, then, whether the district court clearly erred in finding that Kondracki and Kalivoda were not motivated by racial animus, and that they did not know of the Ever Ward incident until after Ratliff was fired.

## II

### The District Court's Factual Findings Are Not Clearly Erroneous

Plaintiff's case, as the district court points out, depends upon the court "believing her version of several incidents which she recalled as opposed to the testimony of defense witnesses." 608 F.Supp. at 1121. The court explained in detail why it believed defense witnesses rather than plaintiff on all of the crucial testimony. The defendant's case, was a "long and well documented account of the plaintiff's short-comings as a police trainee and probationary officer." *Id.* at 1126.

Plaintiff's equal protection claim, like her Title VII disparate treatment claim, depends upon the court believing her testimony rather than that of defense witnesses. Ratliff claims that proof of intentional discrimination against her on account of her race [2] can be found in her account of the remarks made to her and the treatment given to her by Captain Beste and Sergeant Figer at the Police Academy, and by Captain Kalivoda, Lieutenant Kondracki and Sergeant Majkowski at the Third District during her probationary period.

Likewise, Ratliff's conspiracy claims depend upon the court crediting her testimony and that of Officer Morris over that of defense witnesses. Ratliff asserts that Sergeant Figer from the Police Academy, and Captain Kalivoda and Lieutenant Kondracki from the Third District conspired to terminate her for reporting that Officer Fadrowski beat Ever Ward. She claims that this conduct amounted to a conspiracy to obstruct justice in a state system because of her race, which is remediable under 42 U.S.C. § 1985(2), and that their retaliatory conduct violated her constitutional right to free expression under the First and Fourteenth Amendments, which entitles her to relief under 42 U.S.C. § 1983.

Plaintiff asks this court to reject the lower court's credibility assessments and to order a new trial so that the evidence can be re-presented, re-assessed, and re-balanced in a "fairer and more objective fashion". (Plaintiff's Brief at 23). This, we decline to do.

### A. The Standard of Review

Our function is to correct errors of law, and to correct or set aside clearly erroneous findings of fact. Federal Rule of Civil Procedure 52(a) sets forth the standard governing appellate review of a district court's factual findings, including those on discriminatory intent and those on the credibility of witnesses: "Findings of fact,

**2.** *See supra* note 1.

whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." *Anderson v. City of Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985); *Pullman-Standard v. Swint*, 456 U.S. 273, 285–90, 102 S.Ct. 1781, 1788–91, 72 L.Ed.2d 66 (1982).

"A finding is 'clearly erroneous' when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

*Anderson*, 105 S.Ct. at 1512 (citations omitted). Rule 52 demands even greater deference to factual findings based on determinations of the credibility of witnesses, "for only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said." *Id.*

> [W]hen a trial judge's finding is based on his decision to credit the testimony of one of two or more witnesses, each of whom has told a coherent and facially plausible story that is not contradicted by extrinsic

evidence, that finding, if not internally inconsistent, can virtually never be clear error.

*Id.* at 1513.

■ Our task then is not to weigh the evidence in the record anew; instead, we must determine whether the trial judge's interpretation of the facts is implausible, illogical, internally inconsistent or contradicted by documentary or other extrinsic evidence. *Id.* If it is not, the trial court's findings cannot be found to be clearly erroneous. *Id., accord Scandia Down Corp. v. Euroquilt Inc.*, 772 F.2d 1423 (7th Cir. 1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 1801, 90 L.Ed.2d 346 (1986); *Andre v. The Bendix Corp.*, 774 F.2d 786 (7th Cir.1985) (remanded because reviewing court was unable to identify any rational or articulated reason by which the ultimate finding of sex discrimination could be supported); *Tulloss v. Near North Montessori School, Inc.*, 776 F.2d 150 (7th Cir.1985).

■ After carefully reviewing the entire record in this case, we are not left with a definite and firm conviction that the trial court made a mistake.[3] The district court's account of the evidence is plausible in light of the record viewed in its entirety. The judge's decision to credit the testimony of some witnesses over that of others was not clear error. We have searched the record for any indication that the credited testimony or the trial court's account of the evidence was incoherent, internally inconsistent, implausible on its face, or contradicted by extrinsic evidence. We found no such indication, and plaintiff has not convincingly pointed to any. Thus, the trial court did not clearly err in finding that the plaintiff was discharged because of poor perform-

---

**3.** Ratliff's case has now been heard by three fact finders, with varying results. Prior to this suit, after a hearing before the Wisconsin Department of Industry, Labor and Human Relations, Ratliff's race and sex discrimination complaint alleging violations of the Wisconsin Fair Employment Act was dismissed for failure to present a prima facie case of discrimination. Wis.Stat. §§ 111.31–111.37. Reaching a contrary result under the collective bargaining agreement, an arbitrator found that Ratliff had been terminated without cause. He ordered

that she be reinstated with back pay, but the award was vacated by the Circuit Court of Milwaukee County based on the decision in *Milwaukee Police Association v. City of Milwaukee*, 113 Wis.2d 192, 335 N.W.2d 417 (Wis.App.), *review denied,* 114 Wis.2d 602, 340 N.W.2d 201 (Wis.1983), which held that the termination of a probationary employee is not arbitrable under the police collective bargaining agreement. Finally, Judge Warren heard this case *de novo.* It is not our role to retry the facts again.

ance on the job, not because of race or sex discrimination, and not because she reported alleged police brutality to her supervisors in the Fifth District during her field training.

The district court's decision rests upon three findings of fact: (1) that Ratliff was fired because of her poor performance on the job; (2) that race was not a factor in the decision to terminate her as a probationary police officer; and (3) that no conspiracy to fire her existed because those responsible for the decision to fire her had no knowledge of the Ever Ward incident or her conduct in resisting efforts to cover up alleged police brutality prior to her termination. Plaintiff and defendants each presented relatively coherent and facially plausible, though contradictory, reflections of the facts. The trial court's account of the evidence and its credibility determinations are plausible in light of the record, are not internally inconsistent, and are not contradicted by extrinsic evidence.

### B. The Plaintiff Was Fired Because Of Her Poor Performance On The Job

The district court found that Ratliff was fired because of her poor performance on the job, not because of her race. 608 F.Supp. at 1126. Judge Warren found that she failed to demonstrate that she was qualified for police work or that she satisfactorily performed the jobs she was assigned. *Id.* at 1125. This finding was based on a number of subsidiary findings. The court found that Ratliff

> never mastered the art of report writing during the course of her employment; that she consistently filled out inaccurate or incomplete citations; that she was far below the norm in the number of field interrogatories conducted and citations issued; and that she failed to properly maintain her memo book. In addition, the plaintiff demonstrated on one or more occasions a lack of attentiveness to department rules and local ordinances as well as a failure to undertake general preparatory activities expected of police officers prior to their tours of duty.

608 F.Supp. at 1126. There is ample documentary and testimonial support in the record for each of these findings.

As the trial court pointed out, the four periodic evaluations of Ratliff at the Police Academy were generally average except in the areas of criminal law, firearms skills and report writing. Though she eventually passed the criminal law exam and was found qualified in firearms skills, she continued to have a great deal of trouble writing reports. Her first evaluation noted that her reports were often incomplete; that she lacked the ability to make clear, understandable reports; and that there was much room for improvement in spelling, word usage, [verb tenses,] and completeness. Sergeant Figer observed that she would "have to make significant progress in writing reports" and that, if progress was not evident by her second evaluation, he "would not recommend that she be continued as a recruit." Def.Ex. 8–C; 608 F.Supp. at 1113.

Ratliff took Figer's suggestion following the first evaluation and wrote extra reports. In her second evaluation, Figer reported that she showed some improvement, but "still was not proficient in her report writing". Figer's opinion at the time was that "continued improvement could bring her to acceptable levels in this area". Def.Ex. 9–9C; 608 F.Supp. at 1113–14. However, Captain Beste "recorded having reservations about Ratliff and her ability to function as a patrol officer." *Id.*

Likewise, in her third evaluation at the Police Academy "she was characterized as having a total lack of ability to interpret or make reports." *Id.* Special reports were filed on Ratliff's progress during January and February of 1979. These reports were highly critical of her abilities to understand instructions and to concentrate, and of her abilities to write reports and operate firearms. Sergeants Zellmar, Cieslik, and Figer all concluded that Ratliff did not meet Academy standards. However, Figer submitted a later memo in which he reserved judgment on her ability to perform her duties until after her field training, due to

a marked improvement in her writing in the additional practice reports which she had submitted to him.

Ratliff's field training evaluation was average to above average in most categories. However, her supervisor, Officer Richardson, reported that "[s]he has a considerable lack of knowledge in the fundamentals of grammar, spelling and sentence structure", and that she "was able to write good reports only after spending a great deal of time on them." He concluded that with "a concentrated effort in this area she could become a good police officer." Pl.Ex. 20; 608 F.Supp. at 1116.

Ratliff's final evaluation at the Academy was again average in most categories. Sergeant Figer recorded that "reports will continue to give [Ratliff] a great deal of trouble. It will be necessary for her to continue to improve", even though she had made a concentrated effort to improve her report writing abilities. *Id.* Captain Beste considered Ratliff's ability to write reports to be marginal, but noted that she had "displayed a great deal of extra effort in attempting to improve. For this reason we have withheld a recommendation pending her performance during her probationary period." Pl.Ex. 20; 608 F.Supp. at 1116. Despite these reservations, Ratliff was allowed to graduate from the Academy because of the progress she was making, and, according to Captain Beste, she was told that "if she continued to do extra work as she had been, she would be able to successfully complete her probationary career." Tr.Vol. IV, p. 26; 608 F.Supp. at 1116.

At the Third District where Ratliff was assigned after graduation from the Police Academy, she continued to have a great deal of trouble writing reports. There was testimony by Lieutenant Kondracki and Captain Kalivoda, as well as documentary evidence at trial, uncontradicted by other extrinsic evidence, that Ratliff "consistently filled out inaccurate and incomplete citations and reports; that she was far below the norm in number of field interrogations conducted and citations issued; and that she failed to properly maintain her memo book." 608 F.Supp. at 1126. Kondracki also testified that Ratliff received at least one speeding ticket, failed to copy descriptions of suspects and to update her hot car sheet, and that she came to work unprepared (without her riot gear), and in other ways she failed to properly prepare for duty and ignored department rules. On one occasion, she issued night parking tickets on a weekend night when the ordinance was not in effect.

The district court concluded that an abundance of evidence supported defendants' contention that Ratliff was terminated on account of her poor job performance. The findings underlying this conclusion are not seriously challenged by Ratliff. And in any event, the judge's finding in this respect are logical, internally consistent, plausible in light of the whole record, and uncontradicted by extrinsic evidence. Plaintiff admits she made the mistakes which are represented in the exhibits offered at trial by defendants, but testified that those mistakes constituted no more than 5% of all her work and that the majority of the mistakes were made between April and August, 1979, when she was being harassed by her supervisors at the Third District. Ratliff insists that she would have successfully completed her probationary period, but for the fact that Lieutenant Kondracki and Captain Kalivoda harassed her and discriminated against her on account of her sex or race. Alternately and additionally she argues that her resistance to attempts to cover up alleged police brutality motivated Kondracki and Kalivoda to fire her. Ratliff argues that the very fact that defendants documented her mistakes with such extensive and detailed reports shows that they were out to get her because of her race or sex or because of the fact that she reported the beating of Ever Ward and resisted attempts to cover up that alleged police brutality.

## C. Race Was Not A Factor In The Decision To Terminate Plaintiff As A Probationary Police Officer

The trial court was "convinced that race was not a factor in the decision to termi-

nate [Ratliff] as a probationary police officer." 608 F.Supp. at 1125. Plaintiff argues that the trial court erred in focusing on "mere bits of minor evidence" to entirely discredit her testimony and determine its assessment of all of the witnesses overall credibility. She claims that the court ignored the "overwhelming" evidence in plaintiff's favor. First, as direct and indirect evidence of discrimination, the plaintiff points to her testimony regarding racist remarks, attitudes and actions of her supervisors. Second, she argues that discriminatory motive can be inferred from the persistence and intensity with which the defendants scrutinized and recorded her job performance.

The plaintiff testified that Captain Beste, in reviewing her progress after one or more of her evaluations at the Academy, asked her: "Do they have such a thing as english for you people?" She also stated that he told her that she was unqualified, that others were more qualified and that she should not be at the Academy. He purportedly asked her after she failed the criminal law exam: "do you people know anything about the law?" In addition Ratliff testified that Captain Beste referred to her, not as Officer Ratliff, but rather as "you people", or "your kind".

Captain Beste testified that he never used the term "you people" to refer to a single person, and that he referred to plaintiff as "Officer Ratliff, never as 'you people' or 'your kind.' " He denied ever saying to plaintiff that she was unable to read or write, that she did not know English, or that she was unqualified to be at the Academy. In short, Beste denied making any of the racial stereotyping or discriminatory remarks attributed to him. He stated that it was standard procedure to keep a file of the mistakes of any trainee who was below normal in report writing. He did tell Ratliff that she could be a hazard if she did not shoot properly.

Next plaintiff claims that Sergeant Figer used the word "niggerish" to describe her report writing. Figer denied using the derogatory term to describe her spoken English or her written work. He testified that he attempted to explain to Ratliff his understanding of the source of her problems with report writing. He told her that her problems with verb tenses and use of plural and singular forms was "probably because she was black and spoke with a black dialect, and that this mode of communication is what she was used to in her contacts socially, but [he] also informed her at that time that the reports that she was now going to be submitting were going to be used in Court rooms, by judges and attorneys, and that they would have to be written in proper English." Tr.Vol. IV at 86. Ratliff's theory must be that Beste's and Figer's evaluations of her, which were seen by Kondracki and Kalivoda prior to their recommendations that she be terminated, were tainted by discriminatory motives. The trial court credited defendants' testimony over that of the plaintiff.

However, it was the treatment she was subjected to at the Third District as a probationary employee which Ratliff objects to most. Ratliff testified that the third shift commander, Lieutenant Kondracki, called her into his office just about every night to discuss mistakes she made and to harass her. She does not deny making mistakes, rather she complains that his corrective actions were discriminatory. Ratliff maintains that almost every night Kondracki called her into his office, keeping her there for three to five hours at a time, standing at attention. She testified that he was usually angry, that he used profanity and walked around her sticking his finger in her face and that on one occasion he put his finger in her nose. She claims that he often stepped on her feet. He is alleged to have asked: "what kind of schools do you people go to?" And, Ratliff testified that he always considered her "your kind" or "you people" not "police officer Ratliff". Ratliff claims that on 15 or 16 occasions Kondracki denied her the right to go to the bathroom. He allegedly asked if she was married when she gave birth to her child. He also was said to have told Ratliff that she was unqualified to receive her pay, and to have asked her to quit the Milwaukee

Police Department. If she quit, he said she would get excellent references to go to the fire or sheriff's department. Ratliff claims that Kondracki told her that "as far as he was concerned she had no rights as a human being". Moreover, Ratliff asserts that Kondracki ordered her to lie in official reports under pain of discharge if she did not comply. On one occasion, when she tried to record the title of a report he had ordered her to write, she testified that he twisted her arm until she was on her knees in order to get her memo book from her hand. At trial she testified that he twisted her arm in front of her body. However, on a prior occasion, she had testified under oath that he twisted her arm behind her back.

Kondracki, on the other hand, described the many duties of a busy shift commander, reviewed numerous errors that the plaintiff made, and described both his and Sergeant Brinza's efforts at remedial training. Kondracki testified that he never used profanity in conversations with the plaintiff, nor did he remark that "we've had your kind before". He did interview Ratliff a number of times about her work. On these occasions she was not standing at attention, nor did she ever ask to go to the rest room. The sessions generally lasted only about ten minutes, and once for about a half an hour when Ratliff and he met with Captain Kalivoda. On one occasion he spent three to five hours with Ratliff to take a recorded statement from her, on Captain Kalivoda's instructions, reviewing her work and getting her response to the then extensive documentation of her errors so that Kalivoda "could have the whole picture". Kondracki testified that he required her to rewrite numerous reports because of errors and omissions but never dictated the substance of any part of her reports.

Ratliff testified that Captain Kalivoda laughed at her problems with Kondracki, and told her that she had no right to go outside the district (to the Milwaukee Police Association) with her problems or because she felt she was being mistreated as a black woman. She asserts that Kalivoda responded to her requests to be transferred out of District Three by stating: "If we don't want you, then what makes you think anyone else would want you?"

Kalivoda testified that when plaintiff requested a transfer to District Five [where, incidentally, she had done her field training and where the Ever Ward incident allegedly occurred], he sent the request to the personnel bureau according to his normal procedure. When plaintiff requested to be reassigned from jeep checker to a squad car in order to get more experience, Kalivoda granted the request. 608 F.Supp. 1119.

The trial court credited the testimony of Captain Beste from the Police Academy, and Lieutenant Kondracki from the Third District over that of the plaintiff. The court found Ratliff's account of the amount of time she was allegedly required to spend in Lieutenant Kondracki's office to be incredible, because, if her account were true, neither she nor Kondracki could have performed their jobs. In addition, the court pointed out that Ratliff gave conflicting accounts of the arm twisting incident, and that she attributed some of the same remarks to both Kondracki and Beste. Both denied making the racially stereotyping remarks, and the court believed that the "comments were more likely the product of Ms. Ratliff's imagination rather than a manifestation of racial prejudices held by Beste and Kondracki." 608 F.Supp. at 1122. For these reasons the court gave far less weight to Ratliff's testimony than to the testimony of other witnesses. The court chose, for articulated reasons, to believe defendants' testimony rather than Ratliff's. This is entirely within the trial court's discretion, and is not clearly erroneous.

### D. There Was No Conspiracy To Fire Ratliff

The trial court found that there was no conspiracy to fire Ratliff for reporting and then allegedly resisting efforts to cover up alleged police brutality. This finding was based on the court's conclusion that Cap-

tain Kalivoda and Lieutenant Kondracki, the Third District supervisors who were responsible for the recommendation to fire Ratliff, did not know of the Ever Ward incident prior to Ratliff's termination.

As the trial court reported: on February 14, 1979, during Ratliff's two week field training period at the Fifth District, Ratliff and Officers Richardson and Mason investigated a battery complaint. A crowd gathered during the course of their arrest of a suspect, and Richardson called for backup assistance. One of the officers to arrive was William Fadrowski. He proceeded to move people off the street. Ever Ward, a black woman who was related to the arrested suspect, resisted Fadrowski's efforts to clear the street and hit him in the face.

What happened next is a matter of dispute. Ratliff and Police Officer Morris testified that Fadrowski jumped on Ward and beat her. Ratliff testified that just after he was hit, Fadrowski screamed "that black bitch struck me". Morris did not recall hearing Fadrowski make any comment during the course of the arrest, although he was standing within a few feet of the incident. Fadrowski denied making any remark and denied striking Ward, but testified that both he and Ward fell to the ground when he was trying to arrest her. Officers Morris and Jives then lifted Fadrowski off of Ward and arrested her.

Ratliff testified that she reported to her superior officers at the Fifth District that Fadrowski had used excessive force in arresting Ward. She claims that Richardson took her initial report to supervisors and told her to change the report. He allegedly told her at one point to leave out the part about Fadrowski beating Ward. Ratliff claims that Richardson told her "Police officers must stand together" and that "she would be marked" because she reported what she had seen. She also testified that Sergeant Eccher told her to delete part of her report and to include a final paragraph in the third and final version stating that she felt Fadrowski did not lose control or use excessive force in the arrest of Ward.

Richardson testified that the final sentence exonerating Fadrowski was in the initial report submitted by Ratliff, that no one told her to include that statement in any draft of the report, and that she did it on her own. He also stated that he did not show her reports to anyone, but that he requested that she revise the report because of numerous grammatical errors, not because of the substance of the report. He also denied making the comment that Police Officers must stand together.

Officer Morris testified that Sergeant Eccher told him to delete parts of his report of the incident and to answer certain questions posed by Eccher, but that Eccher did not dictate Morris' answers.

The trial court noted that much of Ratliff's testimony was directly refuted by Richardson, who denied telling Ratliff to alter the substance of her report, and that Morris' testimony did not corroborate Ratliff's account in certain respects. Morris was only a few feet away, yet did not recall hearing Fadrowski say anything during the arrest of Ward. The court pointed out that Richardson was no longer a police officer at the time of trial, "a fact which lends greater credibility to his testimony." 608 F.Supp. at 1121.

The most crucial finding made by the court did not concern what happened during the course of Ward's arrest or later at the Fifth District where Ratliff wrote her report. The critical finding was that "[p]laintiff failed to establish that any of her superior officers at the Third District, where she was eventually assigned, knew of the incident prior to her termination." 608 F.Supp. at 1116.

Ratliff testified that Sergeant Figer, the report writing instructor at the Academy, obtained copies of her final report on the Ever Ward incident, that he talked with Sergeant Eccher at the Fifth District during her field training period, and that Figer remarked during a class at the Academy following field training that "Beverly had learned something that maybe she shouldn't have". 608 F.Supp. at 1116 (Tr. Vol. 1, pp. 73–74). There was also evidence

that Kondracki at the Third District later obtained copies of reports Ratliff wrote while she was at the Academy.

Although Figer did talk with Eccher during Ratliff's field training period, he testified that he first learned of the Ever Ward incident at plaintiff's first arbitration hearing. After Ratliff was assigned to the Third District, Kondracki called Figer about Ratliff's Academy training. But those conversations concerned Kondracki's specific requests "about the Academy training program and whether Ratliff received instructions concerning *Miranda* warnings and parking ordinances", not the Ever Ward incident. 608 F.Supp. at 1121. Captain Beste from the Police Academy testified that he first became aware of the Ever Ward incident at a hearing for unemployment compensation which occurred after Ratliff's termination. Tr.Vol. IV, pp. 32–33. Both Captain Kalivoda and Lieutenant Kondracki testified that they did not know of the Ever Ward incident at the time the recommendations to fire Ratliff were made and that they first heard of the incident during the pendency of this case.

Plaintiff attempts to tie the Ever Ward incident to the treatment she allegedly received at the Third District, and to the decision to fire her. The trial court points out that even if Figer knew of the Ever Ward incident, there is no evidence that "his information was passed along to Kondracki and Kalivoda". The fact that Ratliff was graduated from the Academy, in part because of her acceptable performance during field training, and in spite of her severe problems in writing reports, makes it plausible that Figer and Beste knew nothing about the Ever Ward incident, and took no actions because of it. The trial court decided to credit the testimony of defense witnesses who told a coherent and facially plausible story that was not contradicted by extrinsic evidence or internally inconsistent. That decision is not clearly erroneous. *See Anderson*, 105 S.Ct. at 1513. Absent knowledge of the Ever Ward incident, Kondracki and Kalivoda could not have conspired to fire Ratliff because of her role in allegedly reporting and then resisting efforts to cover up police brutality.

III

*Title VII is not Plaintiff's Exclusive Remedy*

■ The district court erred as a matter of law in holding that Title VII is plaintiff's only potential remedy for employment discrimination. "Congress intended to retain preexisting remedies. Only if the right asserted was created by Title VII must it be vindicated through the procedural system set up in the Act." *Alexander v. Chicago Park District*, 773 F.2d 850, 855 (7th Cir.1985) *cert. denied* —— U.S. ——, 106 S.Ct. 1492, 89 L.Ed.2d 894 (1986). The district court improperly dismissed the three claims brought under section 1983 and the claim brought under clause two of § 1985(2) on the theory that Title VII is plaintiff's exclusive remedy. However, the court's alternate basis for dismissing these claims on their merits was correct.

■ Sections 1983 and 1985(2) of Title 42 of the United States Code provide remedies for constitutional violations; they do not impose substantive liability. In dismissing these claims, the district court erroneously relied on the decision in *Great American Federal Savings & Loan Association v. Novotny*, 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), in which the Supreme Court held that an employee can not seek a remedy under § 1985(3) to redress injuries sustained from an alleged conspiracy by his *private* employer to violate § 704(a) of Title VII. John Novotny claimed that his private employer denied equal employment opportunity to women and that he was fired in violation of Title VII for expressing support for women employees. The Court held that where no constitutional violation remediable under § 1985(3) is alleged, Title VII provides the exclusive remedy for a Title VII violation. Justices Powell and Stevens concurred separately, suggesting that Novotny could have maintained his employment discrimination claim based on § 1985(3) if he could have stated a constitu-

tional violation. *Id.* at 379–81, 99 S.Ct. at 2352–53 (Powell, J., concurring) and at 383–85 (Stevens, J., concurring).

In this case, as in *Trigg v. Fort Wayne Community Schools,* 766 F.2d 299 (7th Cir.1985), plaintiff attempted to use remedies available under sections 1983 and 1985 to redress alleged constitutional violations. *See also Alexander,* 773 F.2d at 855–56. Both the Fourteenth Amendment and Title VII grant "public sector employees independent rights to be free of employment discrimination. A plaintiff may sue her state government employer for violations of the Fourteenth Amendment through section 1983 and escape Title VII's comprehensive remedial scheme, even if the same facts would suggest a violation of Title VII." *Trigg,* 766 F.2d at 302. In *Trigg,* the court distinguished *Novotny* on the same basis that we do here: *"Novotny* involved private discrimination, while this appeal involves alleged discrimination by a state employer." *Id.* at 301. Novotny was protected from private discrimination only by Title VII, and was, therefore, limited to the procedures and remedies set up in that Act. Here, Title VII protects the plaintiff from discrimination, and, because she made specific allegations of constitutional violations, the plaintiff is also protected by the Fourteenth Amendment. *Alexander,* 773 F.2d at 855–56. However, since the trial court also reached the merits of Ratliff's non-Title VII claims, we affirm on that alternate basis.

## IV

### *Dismissal of the § 1983 Due Process Claim Was Proper*

The trial court found that Ratliff was not entitled to the procedural safeguards guaranteed by the Due Process clause of the Fourteenth Amendment because she was not deprived of any constitutionally protected property or liberty interest when she was fired from her job as a probationary police officer. 608 F.Supp. at 1128. The plaintiff claims that by terminating her without an adequate hearing, defendants deprived her of a property in-

terest in her job as a probationary employee, and that she was deprived of a liberty interest in pursuing her occupation by being fired from government employment under stigmatizing circumstances which prevented her from following her chosen profession. Violations of the Due Process Clause of the Fourteenth Amendment are remediable under § 1983. There was no error in dismissing plaintiff's due process claim because she did not have a protectable property interest in her job as a probationary police officer under Wisconsin law, nor did the defendants invade any protectable liberty interest.

### *Property Interest*

A property interest in a job is created and "defined by existing rules or understandings that stem from an independent source such as state law." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). The source of the interest must "secure certain benefits" and "support claims of entitlement to those benefits." *Id.* Ratliff did not show that she had "more than a unilateral expectation" of continued employment as a police officer—that she had a "legitimate entitlement" to her job. Under Wisconsin law, a probationary police officer has no more than a unilateral expectation of fulfilling her probationary period and being hired as a permanent officer. *See Kaiser v. Board of Police and Fire Commissioners of City of Wauwatosa,* 104 Wis.2d 498, 311 N.W.2d 646 (1981); *Milwaukee Police Association v. City of Milwaukee,* 113 Wis.2d 192, 335 N.W.2d 417 (Wis.App.), *review denied,* 114 Wis.2d 602, 340 N.W.2d 201 (Wis.1983).

Ratliff argues that the collective bargaining agreement, as construed by the arbitrator in her case, is an independent source of an "understanding" that creates a legitimate claim to and property interest in her job. A property interest in a job can be created by a collective bargaining agreement. *Cf. Roth,* 408 U.S. at 578, 92 S.Ct. at 2709 (university rule or policy). In this

case, the arbitrator held that the termination of a probationary police officer was arbitrable under the collective bargaining agreement, and that a probationary employee could only be fired for good cause. He found that Ratliff was not fired for good cause. However, the Circuit Court of Milwaukee County vacated and dismissed the arbitrator's award in favor of Ratliff based on the decision in *Milwaukee Police Association*, 113 Wis.2d 192, 335 N.W.2d 417 (Wis.App.1983). *Milwaukee Police Association and Beverly J. Ratliff v. City of Milwaukee*, No. 596–174, slip op. (Milwaukee County Cir.Ct. October 5, 1983). Thus, the collective bargaining agreement created no property interest for Ratliff or other probationary employees.

The district court correctly points out that if the termination of a probationary employee was arbitrable, the significance of a probationary term would be wholly vitiated because it would transfer to the arbitrator the power to determine if "an officer should advance from probationary to permanent status or should be terminated during probation." 113 Wis.2d at 196, 335 N.W.2d at 419. This, the court reasoned, would thwart the express power to select which the Wisconsin statute vests in police chiefs and boards. *Id., citing,* Wis. Stat. §§ 62.13(4) and 165.85.

The plaintiff attempts to distinguish the Wisconsin cases by asserting that the employer's motive in those cases was not tainted by racial animus, as is allegedly the case here. The employer's reason for firing a probationary employee is irrelevant to the issue of whether an independent source of state law creates a property interest in continued employment.

### Liberty Interest

■ Similarly, Ratliff failed to prove that she was deprived of a protected liberty interest. Even though she has no protected property interest in her job as a probationary police officer, Ratliff can assert the deprivation of a liberty interest.

A government employee's liberty interests are implicated where in terminating the employee the government "make[s] any charge against [her] that might seriously damage [her] standing and associations in the community" or "impose[s] on [her] a stigma or other disability that foreclose[s] [her] freedom to take advantage of other employment opportunities." *Board of Regents v. Roth,* 408 U.S. 564, 573, 92 S.Ct. 2701, 2707, 33 L.Ed.2d 548 (1972).

*Doe v. United States Department of Justice,* 753 F.2d 1092, 1105 (D.C.Cir.1985); *accord Perry v. F.B.I.,* 781 F.2d 1294, 1300 (7th Cir.1986) (*en banc*). Before a liberty interest is implicated, there must be "some tangible alteration of a 'status' ". *Doe,* 753 F.2d at 1105, *citing Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976). Here, Ratliff's termination as a probationary employee satisfies this first requirement.

■ Second, although the termination for cause does not alone impose the requisite stigma, *see Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (mere failure to rehire non-tenured teacher does not carry such a stigma), a liberty interest is impaired if the government injures the employee's "good name, reputation, honor or integrity, or imposes a stigma that effectively forecloses" the employee's future employment opportunities. *Id.* at 573, 92 S.Ct. at 2707. In terminating Ratliff, the department made charges against her that, according to Ratliff, injured her good name, reputation, honor and integrity and which imposed on her a stigma that effectively foreclosed her ability to obtain other employment in her chosen profession of law enforcement.

■ Any time an employee is involuntarily terminated, some stigma attaches which affects future employment opportunities. This type of harm does not infringe on an employee's liberty interests. However, the charges against Ratliff were so critical of her abilities as a police officer that it would be virtually impossible for her to find new employment in law enforcement. *See Smith v. Board of Education of Urbana School District No. 116,* 708

F.2d 258, 265 (7th Cir.1983) (Constitution requires that employer not "make public statements so critical of plaintiffs' coaching abilities that it would be virtually impossible for them to find new employment in similar coaching position"). Ratliff was charged with unsatisfactory performance and lack of ability, but the specifics were so devastating that it is unrealistic to believe that she could pursue a career in law enforcement, if the reasons were publicized. More importantly, Ratliff was also charged with untruthfulness, failure to obey orders, neglect of duty, and insubordination. Such charges, if false, are defamatory, as they indicate that she is unfit to serve as a law enforcement officer in any capacity. Such charges might also seriously damage her standing and associations in the community. And, if such charges were published, Ratliff had a due process right to a hearing at which she could attempt to refute the charges and publicly clear her name. *See Doe*, 753 F.2d at 1108.

The district court found that even if the stigma imposed did impede Ratliff's subsequent job search, she was not entitled to a hearing upon termination because she did not prove that the discharge was based on *false* and defamatory charges, and because she did not "show sufficient publication of the reasons for her discharge prior to the advent of judicial or similar proceedings." 608 F.Supp. at 1130.

The district court relied upon *Codd v. Velger*, 429 U.S. 624, 628, 97 S.Ct. 882, 884, 51 L.Ed.2d 92 (1977), in which the Court held that the probationary police officer raised no constitutional question because he did not challenge the "substantial truth" of the stigmatizing material. The purpose of the pre-termination "hearing required where a non-tenured employee has been stigmatized in the course of a decision to terminate his employment is solely 'to provide the person an opportunity to clear his name'". 429 U.S. at 627, 97 S.Ct. at 883. If the employee does not challenge the truthfulness of the stigmatizing charges, there is no purpose to the name clearing hearing. "Only if the employer creates and disseminates a false and defamatory impression about the employee in connection with his termination is such a hearing required." *Id.* at 628, 97 S.Ct. at 884.

Ratliff did challenge the charges against her, but did not prove them false. The trial court found that the charges against Ratliff were "essentially true". This determination, as pointed out above, is not clearly erroneous. The trial court recognized that the falsity requirement put Ratliff in an untenable position: "no hearing need be provided unless the charges are false and defamatory, yet, the employee cannot prove the charges to be false and defamatory unless a hearing is provided." 608 F.Supp. at 1130. However, the trial court held that Ratliff "had her opportunity in the hearing before the court to prove the false and defamatory nature of the reasons asserted for her discharge," but the court reached the opposite conclusion. Therefore, the trial court found that Ratliff was not deprived of any liberty interest.

If Ratliff's liberty interest in pursuing her occupation were *implicated* by publicized charges of untruthfulness or gross incompetence, however, the truth or falsity of the charges should have been determined in a "name clearing hearing" provided by the police department. Even though it has now been determined that Ratliff was not deprived of her liberty interest in pursuing her occupation because no false charges were made against her, she would have had a right to attempt to clear her name if her liberty interest were implicated. Clearly, the nature of the charges against her implicated her liberty interest.

The district court also found that Ratliff had "failed to show sufficient publication of the reasons for her dismissal prior to the advent of judicial or similar proceedings". 608 F.Supp. at 1130. In her brief and at oral argument, the plaintiff maintained that publication of the reasons for her discharge within the police department was sufficient, relying on *Doe*. In *Doe*, the plaintiff alleged that the charges of unprofessional conduct and dishonesty

were disseminated to prospective employers. *Doe,* 753 F.2d at 1111–12. Here, there was no evidence at trial that any of the defendants publicized the reasons for Ratliff's discharge beyond the proper chain of command in the police department. In a common law defamation action, any publication of false and defamatory material might be sufficient, but in the context of the liberty interest protected by the Fourteenth Amendment, Ratliff was required to show broader publication. The interest protected by the liberty clause in this context is post employment reputation related to her ability to pursue her profession, not the right to continued employment in the Milwaukee Police Department. Absent proof that the Police Department or any of the defendants disseminated the stigmatizing information in a manner which would reach future potential employers of the plaintiff or the community at large, she cannot show that the defendants' actions impinged on her liberty interest in pursuing her occupation. We have reviewed the record, and find no evidence that the reasons for Ratliff's termination were publicized beyond the police department by any of the defendants. Therefore, the trial court's finding that Ratliff failed to show sufficient publication of the reasons for her dismissal prior to the advent of judicial or similar proceedings is not clearly erroneous. The publication of the reasons in judicial or similar proceedings, which were initiated by the plaintiff after her termination, do not infringe on her liberty interest. *See Bishop v. Wood,* 426 U.S. 341, 348–49, 96 S.Ct. 2074, 2079, 48 L.Ed.2d 684 (1976).[4]

## V

### *Dismissal of the Equal Protection Claim Was Proper*

■ Plaintiff's equal protection claim falls with her Title VII claim because the trial court did not clearly err in finding that she was fired for cause, not for discriminatory reasons. Ratliff's equal protection claim is based on the same factual allegations the court determined in her Title VII claim; that her supervisors at the Police Academy and at the Third District intentionally discriminated against her. She did not carry the burden of proof on the issue of intentional discrimination. Thus, the equal protection claim was properly dismissed.

## VI

### *The Conspiracy Claims Were Properly Dismissed*

Ratliff's two conspiracy claims are based on the defendants' alleged response to the Ever Ward incident. Plaintiff contends that Sergeant Figer and Captain Beste from the Police Academy, and Lieutenant Kondracki and Captain Kalivoda from the Third District conspired to retaliate against her, and to terminate her for reporting, and

---

**4.** If defendants had deprived Ratliff of her liberty interest in pursuing her occupation by publicizing *false* charges of either dishonesty, gross incompetence, or the like, which they did not do, she could not regain her position on the Milwaukee Police Department. Her only remedy would be a name clearing hearing. She complains that defendants deprived her of other job opportunities by firing her for reasons which were stigmatizing, but any adverse consequences suffered by the plaintiff were due to the defendants' justified actions in firing her for cause, stigmatizing or not. "[T]he State remains free to terminate or decline to rehire a non-tenured employee for no reason at all or for stigmatizing, even false reasons privately stated." *Dennis v. S & S Consolidated Rural High School District,* 577 F.2d 338, 343 (5th Cir.1978). Here, the reasons for Ratliff's discharge were privately stated, thus she had no right to a name clearing hearing.

If the defendants had publicized the reasons for her discharge beyond the police department, Ratliff's only remedy would be nominal damages. Ratliff does not complain of sustaining actual damages from the denial of a timely name clearing hearing itself. Her only damages are non-compensable because they arise from the defendants justified actions. Where no damage arises, because there was no deprivation of a liberty interest, and where there is no proof of damages arising from the denial of a timely hearing itself, only nominal damages of not more than one dollar are recoverable for the deprivation of the requisite due process. *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978).

then resisting efforts to cover up the beating of Ever Ward. This, claims plaintiff, was a conspiracy to obstruct justice in the state system which denied her the equal protection of the laws, remediable under the second part of 42 U.S.C. § 1985(2).[5] In addition, she claims that the defendants conspired to retaliate against her for exercising her First and Fourteenth right of free expression, which is remediable under 42 U.S.C. § 1983.

■ The trial court found that Ratliff "failed to show that the defendants even knew of the Ever Ward incident prior to plaintiff's discharge, much less that they conceived of a plan to terminate plaintiff because of her actions relative to that incident." 608 F.Supp. at 1132. Thus, Ratliff failed to prove a conspiracy. This finding, as we have pointed out, is not clearly erroneous; therefore, we affirm the district court's dismissal of the conspiracy claims on that basis alone.[6]

### Conclusion

For the reasons set forth in this opinion, we affirm the District Court's dismissal of all of the plaintiff's claims.

AFFIRMED.

---

**5.** The second part of 42 U.S.C. § 1985(2) provides in relevant part:

> [I]f two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with the intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws,
>
> ...
>
> ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy,

whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

**6.** The district court also stated, as an alternative basis for its holding, that plaintiff was not a person protected by § 1985(2). The plain language of the statute seems to bring plaintiff within the class of people protected, but given our resolution of the case, this is a question we need not decide.